In re A.H. ROBINS COMPANY, INCORPORATED, Debtor.

DALKON SHIELD CLAIMANTS' COMMITTEE, in its own right and on behalf of A.H. Robins Company, Incorporated, Plaintiff,

v.

The AETNA CASUALTY AND SURETY CO., Defendant.

Glenda BRELAND, et al., Plaintiffs,

v.

AETNA CASUALTY AND SURETY COMPANY, Defendant.

Bankruptcy No. 85–01307–R.

Adv. No. 87–1006–R.

Civ. A. No. 86–0315–R.

United States District Court, E.D. Virginia, Richmond Division.

July 26, 1988.

John J. Walsh, Mark C. Ellenberg, Peter M. Dodson, Cadwalader, Wickersham & Taft, Washington, D.C., William R. Cogar, James S. Crockett, Jr., Richmond, Va., Murray Drabkin, Washington, D.C., for Dalkon Shield Claimants' Committee, in its own right and on behalf of A.H. Robins Co., Inc.

Joseph S. Friedberg, Minneapolis, Minn., John A. Cochrane, Cochrane & Bresnahan, St. Paul, Minn., Ronald I. Meshbesher, Paul Bergstrom, Meshbesher, Singer & Spence, Ltd., Minneapolis, Minn., Herbert B. Newberg, Martin J. D'Orno, Herbert B. Newberg, Esq., P.C., Philadelphia, Pa., Murray J. Janus, Theodore I. Brenner, Brenner, Baber & Janus, Richmond, Va., James Hovland, Krause & Rollins, Minneapolis, Minn., Douglas W. Thomson, Thomson & Ellis, St. Paul, Minn., for Breland, et al.

John G. Harkins, Jr., Pepper, Hamilton & Scheetz, Philadelphia, Pa., W. Scott Street, III, William H. Schwarzschild, III, Lynn F. Jacob, Williams, Mullen & Christian, Richmond, Va., A. Peter Brodell, W. Scott Street,

III, Williams, Mullen, Christian & Dobbins, Richmond, Va., for Aetna Cas. & Sur. Co.

Robert E. Manchester, Manchester & O'Neill, Burlington, Vt., John Cole Gayle, Jr., Hubard, Tice, Marchant & Samuels, Richmond, Va., for Rawe claimants.

John T. Baker, Denver, Colo., J. Stephen Proffitt, III, Richmond, Va., Bradley Post, Wichita, Kan., for Pamela Reiter, et al.

Stanley K. Joynes, III, Richmond, Va., for Future Tort Claimants.

Robert E. Manchester, Burlington, Vt., John Cole Gayle, Jr., Richmond, Va., for Carolyn Abernethy, et al.

J. Hunt Brasfield, Alexandria, Va., Michael L. Goldberg, Washington, D.C., for Marcia Rubinroit, et al.

## MEMORANDUM

MERHIGE, District Judge.

This matter came on for a hearing on the reasonableness, adequacy and fairness of the proposed settlement in this cause. At that evidentiary hearing, counsel for the *Breland* class and defendant The Aetna Casualty and Surety Company ("Aetna") appeared and proffered evidence in support of the proposed settlement. Three attorneys for class members were heard, and had the opportunity to present evidence, in opposition to the settlement.

*Background*

In mid–1970, A.H. Robins Company, Incorporated ("Robins") acquired all patent and marketing rights to an intrauterine contraceptive device known as the Dalkon Shield. Even before it ceased manufacturing the device in 1974, Robins received claims for personal injuries allegedly caused by the Dalkon Shield, and the number of claims accelerated substantially until August 1985, when approximately 15,000 claims had been made and more than 6,000 claims were still pending. By August 21, 1985, when Robins filed a petition for reorganization under Chapter 11 of the Bankruptcy Code 11 U.S.C. § 101, *et seq.*, Robins and Aetna, as its insurer, had expended more than $500 million in the defense and satisfaction of such claims.

Aetna had been Robins' insurer for a number of years prior to 1970. Its policies covered the Dalkon Shield until the expiration of the final policy at the end of February 1978.

In 1985, a number of plaintiffs began suing Aetna in its own right, as opposed to merely naming Aetna because of the policy coverage. Prior to Robins' filing its petition, Aetna had been named in approximately 140 lawsuits. By the time of the bankruptcy filing, Aetna obtained a dismissal in approximately 40 of those cases. No plaintiff successfully litigated to its conclusion a case against Aetna in its own right for Dalkon Shield injuries.

Shortly after the filing of Robins' petition, this Court issued a preliminary injunction barring continued prosecution of suits against Aetna and other third parties for Dalkon Shield injuries. The preliminary injunction was twice reviewed and twice affirmed by the Fourth Circuit. *See Oberg v. Aetna Casualty & Surety Co.*, 828 F.2d 1023 (4th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). The Fourth Circuit held, as did this Court, that such litigation would inevitably involve Robins and thereby detract from the reorganization process. *Oberg*, 828 F.2d at 1026. Expeditious reorganization, of course, was necessary to pay claimants as promptly as possible.

On April 9, 1986, the *Breland* complaint was filed in the United States District Court for the District of Minnesota. The Minnesota Court *sua sponte* transferred the case on April 28, 1986 to the Eastern District of Virginia where it was refiled on May 15, 1986. Aetna played no role in the transfer.

The *Breland* plaintiffs are seven female Dalkon Shield claimants who allege injuries caused by the Dalkon Shield. The complaint sought certification of a broad class of Dalkon Shield claimants. Plaintiffs sought relief on theories of negligence, strict product liability, conspiracy, RICO and insurance conspiracy in connection

with Aetna's conduct in providing product liability insurance for Robins. In addition, the complaint alleged that Robins and Aetna improperly settled litigation instituted by Robins relating to the meaning and scope of Aetna's policy coverage (the "coverage litigation") and that the *Breland* class was a third party beneficiary to such settlement.

Aetna answered the complaint denying all liability and raising several affirmative defenses. While Aetna sought to enforce the stay in other Dalkon Shield actions, it did not do so here. Counsel for Aetna represented to the Court that Aetna supported class certification as the most cost efficient procedure for resolving the question of Aetna's liability.

On July 23, 1986, the Court held a pretrial conference. The Court directed the parties to brief the class certification issues, but to engage in no other pretrial activity, such as discovery, so as to avoid any interference with Robins' reorganization efforts.

In briefing the class certification issue, Aetna stipulated that, if the action were certified as a class action and if the claims resolution in *Breland* could be coordinated with the claims resolution process in the Robins reorganization, Aetna would not separately litigate the non-common issues of individual medical causation and individual amount of damages. It would agree that all such issues would be resolved, if reached, in the claims resolution process.

On November 4, 1986, the Court lifted the stay for purposes of allowing the parties to engage in discovery. After conducting a hearing, the Court provisionally certified a class on December 29, 1986.

It should be noted that, prior to the provisional certification, a number of claimants' counsel appeared at one or more hearings and generally expressed the view that their opposition was not primarily to a class certification, but to a mandatory certification.

In February 1987, American Home Products Corporation ("AHP") offered to acquire Robins, allocating to the Dalkon Shield claimants the sum of $1.75 billion, which sum the Dalkon Shield Claimants' Committee agreed was satisfactory. Later that month, AHP withdrew its offer. Shortly thereafter, counsel for Aetna contacted counsel for AHP. AHP counsel communicated a concern over how to insure "global peace" if an acquisition were to proceed. That is, AHP questioned the wisdom of such a substantial investment where Dalkon Shield litigation against third parties, disruptive to the reorganizing or reorganized entity, could continue well beyond consumation of the merger—a position which was clearly expressed at the Court's fairness hearing.

In April 1987, Robins filed its first proposed plan of reorganization. This stand-alone plan provided for the eventual payment of $1.75 billion for Dalkon Shield claims through a letter of credit facility.

Prior to the filing of the first proposed plan, Robins, through the efforts of the Court's Examiner, Ralph Mabey, began negotiations with the Rorer Group, Inc. ("Rorer") concerning a possible merger of the two companies. After such negotiations became known to other parties, Rorer communicated to Aetna its interest in having Aetna aid the reorganization effort. Rorer expressed its concern that claimants might exist who would not be compensated in the reorganization and would continue disruptive litigation. That information was communicated to *Breland* class counsel.

In late April, 1987, the Court, at a hearing relating to the Robins reorganization, inquired whether Aetna could provide an insurance policy which would be "excess" of the claimants' trust under the plan. Indeed, the Court had for some time prior thereto, in open court, been suggesting that Aetna should consider a method of participating in some manner to assist the reorganization efforts. On June 4, 1987, Aetna submitted to the Court a proposal that Aetna issue an insurance policy to the claimants' trust to cover the claims of those "future" claimants who had filed notices with the Court in the reorganization. On June 30, 1987, Aetna and *Breland* counsel met and *Breland* counsel rejected Aetna's proposal. *Breland* counsel made a

counter-proposal which Aetna rejected. During this period, the Court once more issued an informal stay of discovery.

At that meeting, the parties agreed that the amount of class counsel attorneys fees would not be discussed during settlement negotiations. That amount would not be determined until after the case was tried or settled.

On August 19, 1987, the Official Dalkon Shield Claimants Committee filed, by leave of the Court in the interest of avoiding future issues of statutory limitations, an adversary proceeding in its own right and on behalf of Robins. This complaint sought judgment against Aetna for contribution. Aetna, in turn, though denying any liability, filed a counterclaim for contribution against Robins. On September 4, 1987, the Committee's adversary proceeding was stayed, and on October 15, 1987, that proceeding and the *Breland* action were consolidated pursuant to Fed.R.Civ.P. 42(a) and Bankruptcy Rule 7042.

On August 21, 1987, Robins filed a second proposed plan of reorganization which contemplated a merger with Rorer. The proposed plan provided for a payment of $1.75 billion for Dalkon Shield claims. While negotiations continued in *Breland*, no significant progress was made in the summer or early fall.

From November 5 through November 11, 1987, the Court heard evidence on the estimated total value of the Dalkon Shield claims. Before, during and immediately after the estimation hearing, substantial efforts, with the Court's encouragement, were made to develop a consensual plan of reorganization. The possible settlement of *Breland* was included in those discussions. Indeed, class counsel took the position that *Breland* could not be settled apart from a consensual plan.

On December 11, 1987, the Court announced its finding that the aggregate value of Dalkon Shield claims and related administrative expenses was $2.475 billion payable over a reasonable period of time. This announcement led to new proposals being submitted by Rorer, AHP, and Sanofi. During this time, counsel for Sanofi contacted *Breland* counsel regarding the possibility of coordinating a settlement of the class action with the reorganization. *Breland* counsel, however, found Sanofi's proposal with respect to the reorganization unacceptable and declined to negotiate until such proposal was changed.

On December 17, 1987, the Court informed the parties that if a new plan and settlement proposal were not soon filed, the Court would lift the stay in *Breland* and set a new trial date. On January 1, 1988, Robins announced that it had accepted Sanofi's bid. New proposals were submitted by all three companies. It soon became apparent that Robins was most likely to accept the AHP proposal.

Intense negotiations ensued among counsel for Robins, the Official Dalkon Shield Claimants Committee, the *Breland* class, AHP, Aetna and other parties in interest. The Court's Examiner was present as an observer. The goal was to reach an overall resolution of all controversies including Aetna's proof of claim filed in the reorganization, the *Breland* action, and the Claimants' Committee's adversary proceeding. AHP took the position that the successor corporation to Robins must be as free as possible from the burdens and distractions of continuing litigation arising out of the use of the Dalkon Shield, no matter who the defendant might be. At these negotiations, *Breland* counsel made a final proposal, acceptable to all other parties, to Aetna. Aetna accepted, subject to approval of the Court. Settlement of the *Breland* action was made a condition precedent to the Robins/AHP merger and, ultimately, consumation of the Robins/AHP plan of reorganization.

*Settlement Proposal*

The structure of the settlement dovetails the proposed plan of reorganization as reflected by the class certification definitions. By order dated April 12, 1988, the Court clarified the definition of the *Breland* classes. Class A is defined as follows:

All those individuals who have complied, or are deemed to have complied by the demonstration of excusable neglect, with orders of the Federal District Court for

the Eastern District of Virginia governing the filing of proofs of claim and questionnaires noting the use of the Dalkon Shield.

Class B is defined as follows:

> All other individuals who may have been eligible to comply with the orders of the Federal District Court for the Eastern District of Virginia but did not do so and are not deemed to have done so.

The proposed Robins/AHP plan of reorganization provides for the establishment of a Claimants' Trust. Class A members will be able to seek compensation from the trust. Class B members, however, may be procedurally barred from collecting against the trust. The proposed plan provides that some Class B members may collect against the trust only on a subordinated basis. Other Class B members will be completely ineligible.

The various components of the proposed *Breland* settlement would benefit both classes. If the settlement is approved, Aetna will make what is essentially a $75 million cash contribution to the Claimants' Trust. Specifically, it will pay $50 million directly into the Trust and $50 million to AHP, which will then pay $25 million into the Trust and return $25 million to Aetna as a partial premium on insurance. Furthermore, Aetna will provide three insurance policies totalling $350 million. One policy in the amount of $250 million is "excess" over the Claimants' Trust. That is, if and when the Trust is exhausted, Aetna will contribute up to $250 million to the Trust. The other two policies would respond to the claims of Class B members and have come to be known as the "outlier" policies. One $50 million policy would be available immediately and the other $50 million policy would be "excess" to the first. If unused for their primary purpose, the Trust excess and the outlier policies cross over to become excess to each other.

The evidence is unrefuted that the policies in question are unique, both as to coverage and limits, and they could not be placed in the commercial insurance market. Consequently, their commercial value cannot be calculated.

In valuing the settlement from the perspective of the claimants, they will at least receive the $75 million cash contribution to the Trust and, in all probability, the $50 million from the first outlier policy available upon the consumation date. The remaining $300 million in excess policies insures against the inadequacy of the established funds. If it becomes necessary to utilize the excess policies, the settlement value increases as moneys are expended to claimants. Accordingly, the maximum value of the settlement is $425 million, the total of the cash and the policies.

*Standard of Review*

■ In reviewing the proposed settlement, the Court is guided by the teachings of *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976), which describes the factors to consider. Overall, the Court must evaluate the strength of the class claim on the merits. The Court shall not, however, change the fairness hearing into a trial. *Id.* at 1172. In addition, the Court need not conclusively decide unsettled issues at law. *Id.* at 1172–73.

■ In making this evaluation, the Court should consider the extent of discovery that has taken place, the stage of the proceedings, the absence of collusion in the settlement, the experience of class counsel and the attitude of the members of the class, as expressed directly or by failure to object. *Id.* at 1173. Each factor will be considered in turn.

*Extent of Discovery and Stage of Proceedings*

■ The procedural history is unusual in this case in that discovery was interrupted by several stays in order to prevent unnecessary disruption of the reorganization effort. Nevertheless, a substantial amount of discovery was conducted.

Another unusual aspect of this case is the extent to which discovery was available to the plaintiffs' bar prior to the filing of this lawsuit. A Minnesota law firm made available to the plaintiffs' bar its collection of documents and depositions obtained in

bringing nearly two hundred suits against Robins. *Breland* counsel studied these materials before instigating this lawsuit.

In addition, two special masters were appointed by the United States District Courts of Minnesota and Kansas to evaluate documents. Class counsel represented plaintiffs' interests in that discovery process and had access to the special masters' reports. Class counsel were also involved in 1982 in a protracted mail fraud criminal trial relating to the Dalkon Shield in which Aetna materials were explored.

Because of the suits filed against Aetna in the prepetition period, Aetna had directed all of its offices nationwide to collect and ship all Dalkon Shield or Robins related documents to a central depository in Hartford, Connecticut. Over one million documents and numerous transcripts of Aetna personnel taken in Robins cases were collected. Aetna provided class counsel access to this depository.

Commencing in February 1987 and continuing to April, 1987, class counsel, working in three and four person teams, actively reviewed, analyzed and cataloged documents at the depository. The reviewers marked certain documents for copying and shipping to Minnesota and requested that others be contemporaneously copied for immediate study. Aetna cooperated with their efforts.

Approximately 5,000 documents were reexamined at counsel's law offices. The most significant documents were culled and indexed.

After the documents were analyzed, class counsel prepared more than one hundred interrogatories and notified counsel for Aetna of their intention to depose several past and present Aetna employees. At that time, discovery was again stayed.

Class counsel testified that they would want to conduct more discovery before proceeding to trial. Efforts to reach fair and amicable settlements in lawsuits would constitute little saving in effort, expense and judicial expenditure of time if settlement awaited complete preparation for trial. Sufficient discovery to permit counsel and the parties to fairly evaluate the liability and financial aspects of a case are all that are either necessary or prudent. However, considering that Dalkon Shield litigation has been going on now for approximately fifteen years, class counsel already has had access to more information than counsel would in most cases. *Cf. In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 211 (5th Cir.1981) (reasonable evaluation by counsel need not be based on formal discovery where information is otherwise available), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). Counsel's substantial knowledge regarding Aetna's conduct enabled them to make a reasonable assessment of the strength of their case.

The expense and time with which an individual plaintiff would be faced in prosecuting a similar case would be staggering. Class action appears a reasonable method to afford claimants their day in court. The fact that the matter is here in consideration of a settlement does not detract from that established fact.

### Experience of Class Counsel

The *Breland* class is represented by a team of seven law firms with broad and diverse experience and background. All counsel are members in good standing of their respective bars and have never been subject to discipline.

Joseph S. Friedberg's practice has consisted of criminal and civil litigation. He has participated in several cases, as here, involving alleged conspiracy. As mentioned above, he was involved in a document investigation and criminal trial relating to the Dalkon Shield. He is an experienced attorney given the highest rating in Martindale–Hubbell, as are each of the major class counsel. While those counsel opposing the settlement, who to a great extent also hold high professional ratings, made much of the fact that Mr. Friedberg is not known as a personal injury lawyer per se, the Court finds that not to be a necessary qualification. Indeed, the essence of the class case is a far cry from a run-of-the-mill personal injury tort case.

Ronald I. Meshbesher is a senior partner in a product liability law firm. He has been president of the Minnesota Trial Lawyers Association. Like Mr. Friedberg, he was involved in Dalkon Shield litigation prior to the commencement of this suit.

John A. Cochrane has tried numerous personal injury suits. He has been lead counsel in several class actions. Douglas W. Thomson is an experienced trial lawyer in civil and criminal litigation. James Hovland is a civil litigator who specialized in Dalkon Shield cases for a number of years prior to the filing of this action. The Richmond firm of Bremner, Baber & Janus served as local counsel with Theodore Brenner ably coordinating the complex procedural aspects of this case. Herbert B. Newberg is a leading national authority on class action litigation.

The Court finds that class counsel are eminently qualified to represent the *Breland* class.

*Absence of Collusion*

The Court finds no evidence of collusion in negotiating the settlement. The settlement was the product of intense negotiations conducted in conjunction with negotiations regarding the Plan. It would be ludicrous to assert that collusion would have escaped the attention of the Court's Examiner, counsel for the Official Committee of Dalkon Shield claimants, and other parties representing diverse interests, all of whom are experienced and well seasoned veterans of litigation.

Counsel who oppose the settlement assert that the mere fact that this action, and no other, was allowed to go forward is indicative of collusion. They find it suspicious that *Breland* counsel chose to file a class action when they knew that other Dalkon Shield attorneys opposed the use of the class action device. These two assertions, however, cancel each other out. Aetna did not seek to enforce the stay because it believed the class action was the appropriate vehicle for resolving the question of its liability. *Breland* was the first such action filed.

Furthermore, some of the opposition attorneys appear to believe that they themselves have a right to litigate the issues and that that right somehow is being infringed upon by this class action. Some believe that class actions are always improper, and some primarily object to the mandatory aspect of the Court's certification. That belief, however, is not the law.

Counsel for the opposition also assert that the fact that Aetna will pay *Breland* counsel's fees is evidence of collusion. While the parties did agree that Aetna would pay the fees, they declined to discuss the amount so that it would not influence negotiations. If Aetna had not agreed to pay the fees, the Court assumes that *Breland* counsel would have sought payment out of the settlement or judgment after trial. Consequently, *Breland* counsel's settlement demands would have risen and the amount of fees would have become part of the settlement negotiations. The parties' actual arrangement was preferable and proper. It does not support an allegation of collusion.

Accordingly, the Court finds that *Breland* was conducted adversarily and the settlement was reached through arms' length negotiations.

*Attitude of the Members of the Class*

The precise size of the class is, at this time, impossible to calculate. However, the following figures are indicative of their approximate number.

Notice was provided to Class A members in the packages that contained Robins' disclosure statement. Approximately 220,000 of such packages were mailed.

Class B members who had filed claims in the reorganization also received notice by direct mail. 111,746 packages were mailed to such persons. Notice was also provided by publication that contained a mail-in coupon to receive a package. 14,099 such coupons were received and responded to.

Class B members were entitled to opt out. However, only 3,322 filed opt out requests. 2,960 of such requests were timely.

Prior to the hearing, approximately nine objections were filed, some by individual

claimants, others by attorneys representing a number of claimants. At the hearing, the objectors presented several affidavits from attorneys who opposed the settlement. Other class members, however, submitted gratuitous notices of their support of the class action. In addition, the Robins plan of reorganization, of which the *Breland* settlement is a part, was approved by 94.38 percent of the claimants who voted.

Thus, while there is disagreement, the vast majority of the classes appears to be in favor of the settlement.

*Strength of the Case on the Merits*

The crux of plaintiffs' complaint is that, beginning in the early 1970's and continuing into the 1980s, Robins and Aetna allegedly conspired to limit their liability. The evidence and arguments presented to the Court indicate, however, that the case is factually and legally flawed.

The first four counts of the Third Amended Complaint (negligence, strict liability, breach of express warranty, and fraud) relate to considering Aetna a joint participant in designing, manufacturing and labeling the Dalkon Shield. *Breland* counsel admits that these claims are weak. To elevate a product liability insurer to the position of a manufacturer and distributor would require proof of conduct quite peculiar for an insurer. No such evidence was presented to the Court.

In the fifth count, plaintiffs allege a violation of civil RICO. Aetna has brought authority to the attention of the Court that stands for the proposition that civil RICO excludes recovery for personal injury. Counsel for the opposition have not presented any contrary authority.

Plaintiffs' next two counts are conspiracy claims. Plaintiffs assert that Aetna and Robins conspired to limit their liability. They further contend that Aetna itself should have recalled the Dalkon Shield or at least disclosed the risks to the public. In a similar vein, plaintiffs assert that Robins conspired with McGuire, Woods, Battle & Boothe, a law firm that represented Robins in Dalkon Shield litigation. Because Aetna paid the costs of such representa-

tion, plaintiffs assert that Aetna is vicariously liable for the acts of the law firm.

The problematic nature of these claims is obvious. Both an insurer and an attorney owe duties to their insured/client to defend it and protect its confidences. Aetna was subject to an affirmative duty not to use or to communicate information which it received confidentially from its insured. Opposition counsel have brought no authority to the attention of the Court that indicates that an insurer has a duty to a third party that rises above its duty to its insured. Nor have they presented authority that holds that an insurer has the power to recall the product of the insured.

The vicarious liability argument is similarly flawed. Plaintiffs assert that the law firm was acting as an agent for Aetna because its fees were paid by Aetna. However, no authority has been brought to the attention of the Court that stands for the proposition that an insurer's paying counsel fees for the defense of a third party creates an agency relationship between the insurer and the law firm.

In addition to these formidable legal obstacles, the evidence presented in support of these theories is weak. There is evidence that Aetna had knowledge of the manner in which Dalkon Shield litigation was conducted. Beyond that, the evidence is limited. A special master who reviewed privileged documents testified that while there was strong evidence for a case against Robins, he could find no evidence of conspiracy with Aetna or other third parties. *See* Plaintiff's Exhibit 3A.

Lastly, plaintiffs claim that Robins and Aetna improperly settled the coverage litigation in 1987 and that they are third party beneficiaries to such settlement. Like the others, this claim faces legal and factual obstacles. First, it is not at all clear that plaintiffs have standing to pursue a claim based on a contract between Robins and Aetna. Second, the Court's Examiner investigated the settlement and concluded that there is little ground to set it aside.

Accordingly, the Court finds that plaintiffs have a weak case on all counts. Indeed, it is Aetna's position that there is no

case against it. Recognizing that the defense costs of numerous, even if meritless, cases against it would be substantial, Aetna decided it would prefer to make such funds available to claimants rather than attorneys and consequently agreed to settle. The weakness of the case against Aetna is underscored by the fact that AHP is paying a premium to Aetna, independent of the settlement outlined above, of $32 million for the policies Aetna is issuing.

*Due Process*

As previously mentioned, notice of the proposed settlement was given to Class A members in the Robins mailing of its disclosure statement. As for Class B, personal notice by direct mail was sent to approximately 112,000 persons who had submitted claims in the reorganization. The class notice was also published in 1,369 newspapers throughout this country and Canada. As the Court has already determined, the notice constitutes the best notice practicable under the circumstances.

Those objecting to the settlement were afforded a full and fair opportunity to be heard. The objectors combined their efforts and presented evidence and argument through a team of three competent lawyers.

Accordingly, the Court finds that the due process rights of unnamed class members were satisfied.

*Conclusion*

Upon evaluation of all of the relevant factors, the Court finds that the proposed settlement is reasonable, adequate and fair. Indeed, the proposed settlement is in the best interests of both classes of claimants.

An appropriate Order shall issue.

## ORDER

For the reasons stated in the Memorandum this day filed and deeming it proper so to do, it is ADJUDGED and ORDERED as follows:

The proposed settlement in this cause is reasonable, adequate and fair; this cause stands DISMISSED WITH PREJUDICE

except as to the issue of appropriate counsel fees.