The AETNA CASUALTY AND SURETY
COMPANY, Plaintiff,

v.

The HOME INSURANCE COMPANY,
Defendant.

No. 89 Civ. 7043 (BN).

United States District Court,
S.D. New York.

March 27, 1995.

Frank M. Nicoletti, Lowenhal, Landau, Fischer & Bring, P.C., NY City, for Home Ins. Co.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge: [1]

This case is a postscript to the Dalkon Shield mass tort litigation, which involved approximately 400,000 claims and complex litigation in several courts.

Aetna Casualty and Surety Company ("Aetna") was the products liability insurance carrier for A.H. Robins Company, Inc. ("Robins"), manufacturer of the Dalkon Shield intrauterine birth control device ("Dalkon Shield" or "IUD"). Aetna issued primary and excess layer policies, which it then reinsured through the placement of facultative reinsurance with numerous other insurance companies. In the instant case, Aetna

---

1. Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

This matter was reassigned to the writer via regular channels from the Hon. John F. Keenan, U.S.D.J.

maintains that one of its reinsurers, the Home Insurance Company ("Home"), is obligated to indemnify Aetna for Home's pro rata share of claims expenses incurred by Aetna in the defense of Robins.

This matter arises under the court's diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a). The case was tried to the court in a twelve day bench trial. The following constitute the court's findings of fact and conclusions of law pursuant to F.R.C.P. Rule 52(a).

## THE RECORD

Aetna offered the following witnesses: William J. Gilmartin, as an expert on reinsurance contract interpretation; Lee L. Bennett, formerly of Aetna's law department and the individual having direct oversight responsibility for the Dalkon Shield litigation; John F. Shea, Jr., formerly a Judge of the Superior Court of the State of Connecticut and subsequently Vice President and Claims Counsel at Aetna; and Michael C. Rees, an expert on reinsurance accounting currently employed by Aetna.

Home called: James A. Robertson, as an expert on insurance policy wording; John W. Hilton, formerly Senior Vice President and Senior Claim Counsel for Home; William D. McGehee, a director in the Aetna claims department who had worked with Judge Shea to resolve coverage disputes with Robins; Denis Bentley, an expert on reinsurance policy wording; and James F. Duhig, Assistant Vice President in the Home excess lines department.

The following individuals testified by deposition: Edmund Choinski, one of the underwriters of the reinsurance contracts at issue; Anthony N. Christian, the head of reinsurance at Home during the period when the instant reinsurance contracts were issued; Robert J. Hagar, director of Underwriting at Aetna; John L. Hess, underwriter at Aetna in connection with the Robins insurance; and Walter E. Farnam, formerly Assistant Vice President of Underwriting at Aetna.

The parties additionally offered in excess of 150 documentary exhibits, including the policies themselves, billing records, correspondence between the parties, and other relevant items.

## CONTENTIONS OF THE PARTIES

The foundation of Aetna's claim is the contention, that following a dispute with Robins concerning the scope of coverage afforded by the Aetna excess policies, Aetna entered into a settlement with its insured wherein it made a reasonable judgment that Robins' interpretation of the policies would be likely to prevail at trial. Specifically, Robins had argued that Aetna was required under its policies to bear the costs of defending against claims in addition to the policies' liability limits, which Robins argued merely capped Aetna's liability for damages, i.e., compensation for third-party claimants alleging physical injury from the Dalkon Shield. Aetna urges that its settlement of this dispute on terms favorable to Robins proceeded from its own reasonable, good faith interpretation of the Aetna policies, and particularly its decision that the costs of defending Robins against such claims were payable as a supplemental benefit, beyond the monetary loss limitations.

Aetna takes the position, that because the scope of coverage afforded by the Home reinsurance policies is identical to that of the reinsured excess policies, Home was obligated under its contract of reinsurance to indemnify Aetna for allocated claims expenses incurred in defending Robins on a cost-supplemental basis as well.[2] Aetna insists Home must "follow the settlement" with Robins because the Home reinsurance policies, both by their language and by operation of rules of construction peculiar to the reinsurance industry, obligated Home to indemnify Aetna for risks that Aetna reasonably decided were at least arguably covered under the excess policies. Thus, in the absence of clauses in the Home policies stipulating terms different from those of the Aetna policies, and regarding Home's liability for expenses outside its own cap on liability in particular, Aetna con-

---

**2.** Claims expenses are court costs, interest on judgments, allocated investigation and adjustment expenses, and legal expenses. Claims expenses are also known as loss expenses and loss adjustment expenses. *Reinsurance,* glossary at 648 (Strain ed. 1980).

cludes Home was required to reimburse Aetna on a pro rata basis for expenses in addition to damages, the latter of which only was capped by the loss limitations of both the Aetna and Home policies.

Home concedes that it undertook to reimburse Aetna for claims expenses but did so subject to the limit of liability expressed in the Home reinsurance policies. Home maintains that the reinsurance contracts should be interpreted in light of the course of performance, and highlights the fact that Aetna billed reinsurers for expenses subject to limits prior to the Robins settlement. Home argues that any ambiguity concerning coverage for defense costs resulted from a mutual drafting mistake, and accordingly seeks reformation of the contracts.

Home also contends, that although the Aetna policies might reasonably be interpreted to provide for the payment of expenses in addition to Aetna's limit of liability, the Home policies by their express terms limited Home's liability for any payments, whether for damages to claimants or for expenses incurred in defending against such claims, to the dollar limits typed on the declarations pages of its policies. In this respect, Home repeats arguments that it offered, unsuccessfully, during the summary judgment phase of this litigation, summarized *infra*.

Home further insists that the "follow the fortunes" (or "follow the settlements") doctrine invoked by Aetna has no application in facultative reinsurance as opposed to treaty reinsurance.[3] In the alternative, Home argues that even if a duty to follow loss settlements exists in facultative reinsurance, it does so only where explicit clauses exist obligating the reinsurer to follow loss settlements, and not as a matter of industry practice. Home additionally con-

tends that it is relieved of the obligation to follow the Robins settlement because it was neither reasonable nor made in good faith. Finally, Home argues that Aetna failed to prove its damages or its entitlement to prejudgment interest.

## FINDINGS OF FACT

### Background

From March 1968 through March 1978, Aetna was the products liability insurance carrier for Robins. As noted, Aetna spread much of the risk among numerous reinsurers, while keeping a retention of its own approximating $15 million. Home participated as one of Aetna's reinsurers with respect to excess policies in the policy years 1970, 1972, 1973, 1974 and 1976.[4]

In each of the years when Home participated as a reinsurer of Aetna, a reinsurance intermediary acting on Aetna's behalf issued to Home and all other reinsurers a Certificate of Reinsurance.[5] Although some participating reinsurers used the certificates as their contract of reinsurance with Aetna, Home chose to use its own form excess insurance contract as the governing expression of its contract of reinsurance with Aetna, and accordingly manuscripted "R/I", meaning reinsurance, along with certain other information on the declarations page of the form excess policy. The parties have stipulated that the Home form excess insurance policies superseded the certificates that had been issued by insurance intermediaries; thus, the certificates may not be relied upon to determine the intent of the parties as to any material fact in dispute. Rather, the court must refer to the language of the Aetna excess policies and the Home reinsurance contracts to determine the degree to which those policies offer coextensive coverage: for

3. In facultative reinsurance, the ceding company obtains reinsurance for a specific risk or policy. The reinsurer evaluates the risk before agreeing to reinsure it. In treaty reinsurance, by contrast, the reinsurer agrees to indemnify losses incurred on all policies issued by the cedent to its insured. *See Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir.1993).

4. Aetna seeks declaratory judgment concerning the 1970 policy year but does not presently seek

money damages as to that policy year because the damages impacting the 1970 policies have not yet been finally tabulated and billed. Home did not participate in 1971 or 1975.

5. For the 1970, 1972, 1973, and 1974 policy years, the reinsurance intermediary was Herbert Clough, Inc. For the 1976 policy year, the reinsurance intermediary was Guy Carpenter & Company.

if the Home policies indemnify anything Aetna insures, the terms of the Aetna excess policies will be dispositive of Home's liability to Aetna, i.e., unless the Home policies specify an exclusion.

*The Dalkon Shield*

In 1970, Robins acquired the exclusive right to manufacture and sell the Dalkon Shield. Robins introduced the Dalkon Shield into the market in early 1971, and ultimately sold some 2,200,000 IUD's before withdrawing the product in 1974. Soon after the initial sales of the Dalkon Shield, numerous complaints of physical injuries related to the use of the product were reported, including uterine perforations and infections, unwanted pregnancies, spontaneous abortion, fetal injuries and the need for emergency hysterectomies. From 1973 to 1985, some 9,238 claims were asserted against Robins, resulting in payments of approximately $530,000,000. With several thousand cases still pending in various courts, and in the face of a rapidly deteriorating financial situation, Robins was ultimately forced in August 1985 to file for protection under Chapter 11 of the Bankruptcy Code in the United States District Court for the Eastern District of Virginia. By the time the reorganization proceedings were concluded, approximately 400,000 claims were asserted against Robins.

*The Coverage Litigation*

Even before the bankruptcy, however, the sheer number of claims had mounted for a long time, implicating the Aetna excess policies and the reinsurers, including Home. Disputes developed between Aetna and Robins concerning the scope of coverage under the Aetna policies including, *inter alia*, the question of whether a claim was covered at the time of exposure to the IUD as opposed to manifestation of injury, whether Aetna was required to indemnify Robins for punitive damages, and the conduct of litigation on behalf of Robins. In 1977, Aetna and Robins entered into an Interim Agreement, which provided in relevant part:

> IT IS THEREFORE NOW UNDERSTOOD AND AGREED BY AND BETWEEN AETNA AND ROBINS:
>
> (1) That Aetna will continue to defend the aforesaid Dalkon Shield cases and all similar cases filed in the future which come within the coverage of the Policies as they may be modified by this Agreement (hereinafter referred to as "said cases"). The terms "Policies", as used in this agreement, means all contracts or policies of liability or indemnity insurance ever issued, both as of the date of this agreement and in the future, by Aetna and insuring Robins.
>
> (11) That both parties hereby agree henceforth to be bound by the terms and conditions of the Policies when read in conjunction with this agreement; further, this agreement is hereby issued as an endorsement by Aetna which forms a part of the Policies.

Plaintiff's Exhibit 18. The Interim Agreement further established that Aetna would bear no liability for punitive damages. *See id.* at ¶¶ 3, 7.

Before the Interim Agreement was concluded between Aetna and Robins, the intermediary, at Aetna's request, forwarded the final version of the Interim Agreement to Home and the various reinsurers for their comments and questions. In a letter from Assistant Vice President John W. Hilton to Walter C. Ball, Assistant Vice President of Guy Carpenter & Company, the reinsurance intermediary which replaced Clough in 1976, Home consented to the terms of the Interim Agreement, stating:

> We have given careful consideration to your request on behalf of the Aetna Casualty & Surety Company as respects their most recent "agreement" with A.H. Robins Company relating to coverage problems/disputes arising out of the Dalkon–Shield litigation. *The Home Insurance Company consents to following the reinsured concerning the application of this agreement to the Dalkon–Shield litigation.*

Plaintiff's Exhibit 33 (emphasis added).

The effect of the Interim Agreement and Hilton's confirmatory letter was to change the contract between Aetna and Robins on the one hand and between Aetna and its reinsurers on the other. Specifically, whereas before 1977 there was no duty to defend the insured under the excess policies, the Interim Agreement created a new duty on the part of Aetna to defend Robins against

any then pending and future claims, as well as a duty on the part of the reinsurers to reimburse the ceding company, i.e., Aetna, for its expenses in connection with said defense.

Home argues that Aetna undertook this new duty without first notifying the reinsurers. In this vein, Home points to a nine page legal opinion by Aetna's counsel that preceded the agreement and did not discuss the new duty to defend, as such. Defendant's Exhibit ca. The court disagrees. Hilton acknowledged receipt of the proposed Interim Agreement and consented on behalf of Home to "following" it. The Interim Agreement spells out quite clearly that Aetna would undertake to defend pending and future claims concerning physical injury from the Dalkon Shield.

The 1977 Interim Agreement did not finally resolve the coverage dispute. On April 13, 1979 Robins brought a declaratory relief action against Aetna in the Virginia Court of Chancery in Richmond (the "coverage litigation"). In the lawsuit, Robins alleged that Aetna erroneously charged defense costs to the limit of liability under the Aetna excess policies. See Plaintiff's Exhibit 35. As the coverage litigation progressed, Robins pointed out that the 1977 Interim Agreement created a new duty to defend Robins, the costs of which defense were not capped by an overall policy liability limit. Since Aetna contends in this action that it reasonably found Robins' claim to be based upon a permissible construction of the excess policies, it is necessary to examine in detail the policy language for each of the affected years.

*Ultimate Net Loss*

As a threshold matter, the court's discussion of the scope of coverage afforded by the policies requires that they be appropriately classified within the universe of possible poli-

cy options. Coverage may be limited to the payment of indemnity, i.e., amounts recovered by third-party claimants against the insured in the form of damages, or it may also include allocated claim expenses.

The starting point, therefore, is to determine whether claims expenses are within the scope of coverage at all. If that question is answered in the affirmative, the court must examine whether those expenses are enumerated within the policies' definition of ultimate net loss. In all the policies relevant here, the limit of liability caps ultimate net loss.[6] If expenses are covered by the policies, and if the duty to pay such expenses is not encompassed within the definition of ultimate net loss, it follows that the insurer's liability for expenses is in excess of whatever sums it must pay for ultimate net loss. If the limit of liability does not serve as a cap on all payments under the policy, then the ceding company's liability for those expenses is simply unlimited.

■ A policy that includes no duty to defend the insured and no provision for the payment of defense costs by the insurer is referred to as "cost-exclusive." Under a cost-exclusive policy, the insurer is bound only to indemnify the insured for damages it must pay to claimants. The insured must bear the costs for investigating and defending against such claims.

■ Alternatively, a policy that provides for a duty to defend subject to an overall limit of liability is "cost-inclusive." Under a cost-inclusive policy, the maximum liability of the insurer to its insured is capped by the limit of liability expressed in the policy, and both indemnity payments for claimants and the costs of defending against such claims will be charged against the limit of liability. After the cap is reached, the insurer bears no further obligation under the policy.

6. There is a critical distinction between two types of limit on liability. The Aetna excess policies here at issue, as well as the Home reinsurance policies, contain "loss" limitations, i.e., dollar limitations on the liability of the insurer/reinsurer for ultimate net loss. The facultative certificates, which were superseded by the Home policies, contained "policy" limitations, *viz.*, a cap on *all* payments which a reinsurer may be required to make by way of indemnification of the ceding company. The same facultative certifi-

cates superseded by the Home policies were the certificates that formed the basis of the district court's ruling in *Bellefonte Reinsurance Company, et al. v. Aetna Cas. & Sur. Co.*, 1989 WL 106469, 1989 U.S.Dist. LEXIS 10432 (S.D.N.Y. September 5, 1989), *aff'd*, 903 F.2d 910 (2d Cir.1990). Indeed, it is the fact that those certificates possessed "policy" limitations that precluded Aetna from prevailing in *Bellefonte* on the same arguments offered in this case. 1989 WL 106469 at *2, 1989 U.S.Dist. LEXIS 10432 at *5.

■ Finally, where the policy places in the insurer a duty to defend the insured but does not by its terms include those costs within the limit of liability such a policy may be termed "cost-supplemental."

As stated, the limit of liability under the Aetna policies caps ultimate net loss. Examination of the definition of ultimate net loss in each of the policy years reveals that by its terms such loss refers solely to damages, i.e., payments made by Aetna to indemnify Robins for third-party physical injury claims asserted against Robins. Hence, if Aetna had any duty to bear the costs of defending Robins, those costs were outside ultimate net loss and were not capped by the limit of liability in the Aetna policies. The Aetna excess policies at issue here provided as follows:

| | | |
|---|---|---|
| 3/1/68–3/1/71 | No. 58 XS 23 | Aggregate limit of $24 million |
| 3/1/71–3/1/72 | No. 58 XS 656 | Aggregate limit of $30 million |
| 3/1/73–3/1/74 | No. 58 XN 10 | Aggregate limit of $50 million |
| 3/1/74–3/1/75 | No. 58 XN 11 | Aggregate limit of $50 million |
| 3/1/76–3/1/77 | No. 58 XN 19 | Aggregate limit of $50 million |

The definition of ultimate net loss in each of the above excess policies differed from year to year, but on its face included only the duty to indemnify Robins for damages suffered by claimants, with the sole exception of the 1970 policy year, discussed in greater detail in Part VII, *infra.* The definition of ultimate net loss in the 1972 Aetna excess policy was:

**58 XS 656 SCA:** **5.14** "ultimate net loss" means
**(1972 policy)** the sum actually paid or payable in cash in the settlement or satisfaction of any claim or suit for which the insured is liable either by adjudication or settlement with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, *but excludes all loss expenses and legal expenses* (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. Plaintiff's Exhibit 2 (emphasis added).

7. The primary policies for all policy years relevant to this action contained the following language, which explicitly included claims expenses within the limit of liability:

IV. *LIMITS OF LIABILITY*
"The limit of liability stated in the declarations as applicable to 'each claim' is the total

Thus, the 1972 policy explicitly excluded claims expenses from the definition of ultimate net loss, and did not otherwise provide that such expenses were within the scope of coverage. In 1973, Aetna employed similar language in its excess policies to define loss; however, it later determined that the explicit exclusion of claims expenses from the 1973 definition of loss was not concurrent with the language in the primary layer, which stated clearly that claims expenses *were* within the scope of coverage, and were included within its limit of liability.[7] Realizing that the contrasting language of the policies could leave Robins with a gap in coverage, Aetna amended the 1973 excess policy by deleting the exclusion of expenses from its definition of loss. The 1973 definition is provided below, with the subsequently deleted portion underscored and in brackets:

**58 XN 10 SCA:** "Excess net loss" means that part
**(1973 policy)** of
The total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underwriting Insurance, if written without any limit of liability, less realized recoveries and salvages,

which is excess of

any self-insured retention and the total of the applicable limits of liability of all policies described in Section 3, Schedule of Underlying Insurance; whether or not such policies are in force. [Loss shall not include any costs or expense in connection with the investigation or defense of claims or suits, or interest on any judgment which accrues after entry of the judgment.] Plaintiff's Exhibit 3 (emphasis added).

Aetna requested that its insurance intermediaries communicate a request to the reinsurers that they amend their certificates to reflect the inclusion of claims expenses with-

limit of the Company's liability for all Damages and for all expenses incurred under the Supplementary Payments Provisions (other than salaries of the Company's employees) because of Bodily Injury or Property Damage to any one person." Plaintiff's Exhibit 59.

in ultimate net loss, and thereby, within the limit of liability. The purpose of this request was to preserve concurrency between the excess policies and the reinsurance policies.

Aetna's efforts to preserve policy concurrency are significant to the resolution of this matter. Accordingly, it is appropriate at this juncture to discuss two closely related assumptions that form part of the custom and practice of the insurance and reinsurance industries. First, as concerns the relationship between a primary layer insurance policy and an excess layer policy, any discrepancy between the scope of coverage under the excess policy and the underlying primary policy will potentially expose the insured to a gap in coverage; this was of critical importance to Aetna when it discovered that the wording of its excess policy in 1973 provided more restricted coverage than was offered by the primary policy. Second, as between the reinsured policy and the policy of reinsurance (in this case the Aetna excess policies and the Home reinsurance policies) there is a similar need for concurrency. Concurrency is accomplished through operation of a standard "following form" clause, which may read as follows:

> This Policy is subject to the same warranties, terms and conditions (except as otherwise provided herein) as are contained in or as may be added to the Underlying Coverage prior to the happening of an accident or occurrence, whichever is applicable, for which claim is made hereunder.

Similarly, in stipulating that it would "follow" Aetna with regard to the 1977 Interim Agreement, Home represented to Aetna that it would be following form as to that endorsement.

█ Where a following form clause is found in the reinsurance contract, concurrency between the policy of reinsurance and the reinsured policy is presumed, such that a policy of reinsurance will be construed as offering the same terms, conditions and scope of coverage as exist in the reinsured policy, i.e., in the absence of explicit language in the policy of reinsurance to the contrary. Thus, the reinsurance policy indemnifies the reinsured policy for all payments made pursuant to its terms unless an exclusion is spelled out in the policy of reinsurance. Thus, Aetna's request to the reinsurers to alter their policies was necessary because concurrency between the insurance and reinsurance policies is a what makes reinsurance work; if the insurance policy is triggered, it should follow that the reinsurance policy is similarly triggered. It is for that reason that Aetna sought to obtain the agreement of the reinsurers to conform their certificates (and Home's own reinsurance policy) to the endorsements made to the Aetna excess policies; subsequent to the making of a contract of reinsurance, if a modification to the reinsured contract is not matched by a mirror image change in the policy of reinsurance, reinsurance will *not* work with respect to later claims involving that modification. Put another way, the operation of concurrency breaks down if the policy of reinsurance is not brought into line with the material change in the reinsured policy.

The intermediary complied with Aetna's request and forwarded to Home two alternatives for endorsing the Home policy and altering the definition of ultimate net loss to create a cost-inclusive policy. The first wording simply stated, "it is hereby understood and agreed that allocated claims expenses are included in the certificate limits." Plaintiff's Exhibit 30. Home, however, chose to endorse its policy with the second sample wording because it tracked nearly verbatim the wording of the Aetna excess policy. This wording, adopted as Endorsement 3 of the Home Policy for 1973, stated,

> "In consideration of the premium charged, it is hereby understood and agreed that 'Ultimate (or Excess) Net Loss' means that part of the total of all sums which the insured becomes legally obligated to pay or has paid, as damages on account of any one accident or occurence [sic]...."

*Id.*

█ It is understood both according to the dictionary definition and within the industry that "damages" includes loss compensation but not defense expenses. Record at 91. Therefore, the court finds that Endorsement 3 of the 1973 Home Policy unambiguously defined ultimate net loss as excluding allocat-

ed claim expenses, thus leaving the Policy by its terms cost-exclusive, just as it had been before the adoption of Endorsement 3.

In 1974, Aetna defined loss under its excess policy with language identical to that appearing in the endorsed version of the 1973 policy, i.e., by leaving out the language that had previously excluded claims expenses from the definition of loss:

58 XN 11 SCA: "EXCESS NET LOSS" means
(1974 policy)    that part of
The total of all sums which the insured becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence and which would be covered by the terms of the Controlling Underwriting Insurance, if written without any limit of liability, less realized recoveries and salvages,

which is excess of

any self-insured retention and the total of the applicable limits of liability of all policies described in Section 3, Schedule of Underlying Insurance; whether or not such policies are in force. Plaintiff's Exhibit 4.

By 1976, however, Aetna had forgotten to conform the language of its excess policy with that of the underlying primary layer— as it had sought to do in 1973 and 1974—and, as a result, the excess policy once again contained a cost-exclusive definition of loss:

58 XN 19 SCA: "EXCESS NET LOSS" means
(1976 policy)    that part of the total of all sums which the INSURED becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the Controlling Underlying Insurance, if written without any limit of liability, less realized recoveries and salvages, which is excess of any self-insured retention and the total of the applicable limits of liability of all policies described in Section 3, Schedule of Underlying Insurance; whether or not such policies are in force. *Loss shall not include any costs or expenses in connection with the investigation or defense of claims or suits, or interest on any judgment which accrues after entry of the judgment.* Plaintiff's Exhibit 5 (emphasis added).

In sum, as to the 1972 and 1976 Aetna policies, claims expenses were explicitly excluded from the definition of ultimate (or excess) net loss. The 1973 and 1974 policies, although not containing the same exclusions, did not list claims expenses with damages as items contained within the definition of loss. Nor did the 1973 and 1974 excess policies provide by their plain language that claims expenses were capped by any limit of liability (as did the primary policies, *see* note 6, *supra*).

Each of the excess policies was reinsured. The reinsurers participated in layers, usually comprising a $10 million fraction of the overall Aetna excess policy. The Aetna policies were reinsured according to the following formula:

1972 Policy Year: (Aetna Excess Policy 30M xs 5M Primary)

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 10M xs 25M | London | 25.00 | 10.00% |
| | First State | 20.00 | or |
| | **HOME INSURANCE CO** | 10.00 | $1M |
| | Fireman's Fund | 10.00 | |
| | Midland | 10.00 | |
| | Agency Manager | 5.00 | |
| | Calif. Union | 5.00 | |
| | ESLIC | 5.00 | |
| 10M xs 15M | London Market | 46.00 | NONE |
| | American Re | 11.50 | |
| | Midland Ins. | 10.00 | |
| | North Star Re | 10.00 | |
| | Agency Managers | 7.50 | |
| | Constitution Re | 5.00 | |
| | Gerling Global | 5.00 | |
| | INA | 5.00 | |

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 5M xs 10M | INA | 40.00 | NONE |
| | London Market | 30.00 | |
| | North Star Re | 20.00 | |
| | Constitution Re | 10.00 | |
| 5M xs 5M | London Market | 58.00 | NONE |
| | North Star Re | 20.00 | |
| | General Re | 12.00 | |
| | Gerling Global | 10.00 | |

1973 Policy Year: (Aetna Excess Policy 50M xs 5M Primary)

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 10M xs 45M | **HOME INSURANCE CO** | **55.00** | NONE |
| | Federal Ins. | 25.00 | |
| | ECRA | 10.00 | |
| | New England Re | 10.00 | |
| 10M xs 35M | Philadelphia | 20.00 | NONE |
| | Service Fire | 15.00 | |
| | ECRA | 10.00 | |
| | New England Re | 10.00 | |
| | Prudential | 10.00 | |
| | Skandia Ins. | 10.00 | |
| | London Market | 7.00 | |
| | Ins. Co. Penn | 5.00 | |
| | Constitution | 5.00 | |
| | Lumbermans | 5.00 | |
| | Bellefonte Re | 1.50 | |
| | American Re | 1.50 | |
| 10M xs 25M | London Market | 25.00 | 10.00% |
| | New England Re | 20.00 | or |
| | **HOME INSURANCE CO** | **15.00** | $1M |
| | Midland Ins. | 10.00 | |
| | American Re | 7.00 | |
| | Agency Manage. | 5.00 | |
| | Calif. Union | 5.00 | |
| | Mission Ins. | 3.00 | |
| 10M xs 15M | London Market | 46.00 | NONE |
| | American Re | 11.50 | |
| | Midland Ins. | 10.00 | |
| | North Star Re | 10.00 | |
| | Agency Manage. | 7.50 | |
| | Constitution | 5.00 | |
| | Gerling Global | 5.00 | |
| | INA | 5.00 | |
| 5M xs 10M | INA | 40.00 | NONE |
| | London Market | 30.00 | |
| | North Star Re | 20.00 | |
| | Service Fire | 10.00 | |
| 5M xs 5M | London Market | 70.00 | |
| | North Star Re | 20.00 | |
| | Gerling Global | 10.00 | |

**1974 Policy Year:** (Aetna Excess Policy 50M xs 5M Primary)

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 10M xs 45M | **HOME INSURANCE CO** | 55.00 | NONE |
| | Federal Ins. | 25.00 | |
| | Philadelphia | 10.00 | |
| | New England | 10.00 | |
| 10M xs 35M | Philadelphia | 20.00 | NONE |
| | London Market | 15.00 | |
| | Midland Ins. | 10.00 | |
| | New England | 10.00 | |
| | Service Fire | 10.00 | |
| | Skandia Ins. | 10.00 | |
| | Unigard Ins. | 10.00 | |
| | Constitution | 5.00 | |
| | Ins. Co. Penn. | 5.00 | |
| | Lumbermans Mut | 5.00 | |
| 10M xs 25M | London Market | 25.00 | 10.00 |
| | New England Re | 20.00 | or |
| | **HOME INSURANCE CO** | 15.00 | $1M |
| | Midland Ins. | 10.00 | |
| | Agency Managers | 5.00 | |
| | Ins. Co. Penn. | 5.00 | |
| | Mission Ins. | 5.00 | |
| | Service Fire | 5.00 | |
| 10M xs 15M | London Market | 25.00 | NONE |
| | Service Fire | 15.00 | |
| | Agency Managers | 10.00 | |
| | Bellefonte Ins. | 10.00 | |
| | Midland Ins. | 10.00 | |
| | North Star Re | 10.00 | |
| | Unigard Ins. | 10.00 | |
| | Constitution Re | 5.00 | |
| | INA | 5.00 | |
| 5M xs 10M | INA | 40.00 | NONE |
| | London Market | 30.00 | |
| | North Star Re | 20.00 | |
| | Service Fire | 10.00 | |
| 5M xs 5M | London Market | 70.00 | NONE |
| | North Star Re | 20.00 | |
| | Service Fire | 10.00 | |

**1976 Policy Year:** (Aetna Excess Policy 50M xs 5M Primary)

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 3M xs 52M | NACPAC | 100.00 | NONE<br>NONE |
| 7M xs 45M | Philadelphia | 28.570 | |
| | Bellefonte | 14.286 | |
| | Constitution | 14.286 | |
| | ECRA | 14.286 | |
| | New England | 14.286 | |
| | CMC | 7.143 | |
| | Transatlantic | 7.143 | |

| LAYERS | REINSURERS | PERCENT PARTICIPATION | AETNA RETENTION |
|---|---|---|---|
| 20M xs | London Market | 20.75 | 8.75% |
| 25M | **HOME INSURANCE CO** | **10.00** | or |
|  | New England | 10.00 | $1.75M |
|  | Philadelphia | 10.00 |  |
|  | Prudential | 7.50 |  |
|  | Transatlantic | 7.50 |  |
|  | A.H. Robins | 5.08 |  |
|  | INA | 5.00 |  |
|  | NACPAC | 5.00 |  |
|  | Skandia Ins. | 5.00 |  |
|  | General Re | 2.92 |  |
|  | ECRA | 2.50 |  |
| 15M xs | London Market | 30.57 | 10.00% |
| 10M | General Re | 26.11 | or |
|  | Calvert | 10.00 | $1.5M |
|  | A.H. Robins | 8.34 |  |
|  | NACPAC | 6.66 |  |
|  | North Star Re | 6.66 |  |
|  | Bellefonte | 1.66 |  |
| 5M xs | London Market | 55.00 | 15.00% |
| 5M | Constitution | 20.00 | or |
|  | A.H. Robins | 10.00 | $750,000 |

---

Defendant's Exhibit "db".[8]

A reinsurer would only become liable if the relevant layer in which it participated was "pierced" upon the exhaustion of the underlying layer(s). A reinsurer's limit of liability for loss payments would then be governed by its percentage of that layer. Thus, taking the 1976 policy year as an example, it would not be until Aetna had incurred $25 million in liability—$5 million under the primary policy and then $20 million in the excess policy— and had billed its reinsurers in the initial, lower layers that the third layer, denominated as $20 million excess of $25 million, would be triggered. While that layer was "in play", Home would be responsible for its pro rata share of damages charged against the layer, namely 10.00% of $20 million, i.e., assuming that it were not also responsible for a similar pro rata share of expenses outside the limit of liability.

*The 1984 Settlement Agreement*

Throughout the coverage litigation, Aetna kept Home and the other reinsurers apprised as to all developments. Aetna's management believed that the reinsurers were legally bound to follow its fortunes as regarded any settlement Aetna made with Robins, where such settlement proceeded from a reasonable, *bona fide* interpretation of the scope of coverage afforded by the Aetna policies. Nevertheless, to avoid exchanging a litigation with its insured for litigation with the reinsurers, Aetna sought to negotiate a "global peace" that would include the reinsurers, whereby, in exchange for certain incentives, they would agree to indemnify Aetna for its payment under the excess policies pursuant to the settlement. John F. Shea, Vice President and Claim Counsel for Aetna and former Superior Court Judge in Connecticut, considered that the issue of whether expenses were payable outside the liability limits of the Aetna policies, although added to

8. This exhibit does not provide the breakdown for the 1970 policy year, as to which Aetna seeks

declaratory judgment.

Robins' complaint subsequent to the commencement of the coverage litigation, was the most significant issue in the litigation. Shea examined the wording of the Aetna excess policies and determined the chance of successful defense for each policy year. In essence, Shea made a prediction as to what construction the Chancery Court would be likely to place on the various ultimate net loss clauses in the relevant policy years.

Specifically, Shea sought to forecast whether any of the clauses, all of which were cost-exclusive by their terms, would be construed as cost-inclusive, possibly as the result of extrinsic evidence to that effect. For 1971 and 1972, Shea placed Aetna's chances of success at 10%. For 1973 and 1974, which carried language reflecting Endorsement 3, Shea placed the success rate at 60%. For 1975, 1976 and 1977, which did not carry the language found in the 1973 and 1974 policies, Shea estimated a 20% chance of success. Shea testified that the chances of success for 1973 and 1974 were better than even, mainly because extrinsic evidence could establish that exclusion of claims expenses had been deleted by a modification intended to achieve cost-inclusiveness, even if the remaining language seemed to include only the payment of damages within ultimate net loss. These estimates were circulated to the reinsurers via the reinsurance intermediaries in 1983. Plaintiff's Exhibit 42.

Owing to the low likelihood of success for some years, Shea considered it advisable to settle with Robins. A letter circulated to the reinsurers in 1983, in addition to containing Shea's success estimates, also outlined a settlement plan, which encompassed all other issues relative to the coverage litigation. This plan was adopted in the 1984 Agreement between Aetna and Robins. Plaintiff's Exhibit 19.

Rather than stipulate that the policies were cost-supplemental, as Shea determined they might well be found to be, Aetna extended the policy limits according to a formula that would take the estimated amount of expenses into account. These policies were to be then treated for billing purposes as cost-inclusive.

Shea arranged the settlement with Robins, as to which he concurrently obtained the cooperation of the reinsurers, according to a complex formula. He estimated the degree to which expenses costs exceeded indemnity payments and factored in the likelihood of victory on each of the policy years. Thus, the settlement agreement was predicated on the formula:

$$(\$\ Limit \times .26) - \%\ chance\ of\ successful\ defense = Net\ Contribution\ Above\ Limit.$$

Plaintiff's Exhibit 42 at 5. As an incentive to the reinsurers to participate, Judge Shea established an overall rebate of $3,000,000 to all reinsurers who would follow the settlement according to its terms, which the participating reinsurer would obtain according to its proportional share of all reinsurance at issue. *Id.* at 9. Shea's formula resulted in an original settlement of $59 million between Aetna and Robins, as to which certain reinsurers ultimately participated. Shea made an additional allowance for $5 million to be paid by Aetna to Robins and which the reinsurers would not indemnify, relating to allegations that an Aetna claims adjuster had engaged in part-time work for claimants' attorneys at the time he was adjusting claims. This conflict-of-interest problem was treated by Aetna as solely Aetna's problem. ("The Minnesota Problem"). Additionally, due to a breakdown in the settlement between Aetna and Robins, Aetna finally added an additional $11 million to the settlement, but did not pass that cost on to the reinsurers. As the reinsurers had already been consulted on the $59 million settlement, and Judge Shea was reluctant to advise Aetna's management to propose negotiations to the reinsurers that they accept additional liability due to Robins' latest demands, Aetna undertook to bear the costs of concluding the settlement with Robins on its own. Record at 682–84.

Most reinsurers agreed to follow Aetna, but several did not. Six reinsurers filed the *Bellefonte* action. After Home failed to comply with numerous billing requests for expenses (Plaintiff's Exhibit 41), Aetna maintained this action.

## PROCEDURAL HISTORY

Prior to trial, Home interposed a motion for summary judgment, urging that its liability to Aetna was capped by the stated policy limits under Item 3 of the Home · policies' declarations page. Home pointed to subparagraph (c) of the terms and conditions page:

[I]t is expressly agreed that liability shall attach to the Company [Home]:

(c) in no greater amount than the limit(s) set forth under item 3 of the Declarations ultimate net loss as respects each accident or occurrence, whichever is applicable, taking place during the period of this Policy— Subject to the limit(s) set forth under Item 3 of the Declarations ultimate net loss in the aggregate where applicable for each annual period during the currency of this Policy.

Home took the position that irrespective of whether expenses, if covered, were within the definition of ultimate net loss, the limit of liability under the policies was coextensive with the limit of liability set forth under item 3 of Declarations ultimate net loss. Home relied heavily upon *Bellafonte Reinsurance Co., et al. v. The Aetna Casualty and Surety Co.*, 1989 WL 106469, 1989 U.S.Dist. LEXIS 10432 (S.D.N.Y.1989), *aff'd*, 903 F.2d 910 (2d Cir.1990), in which the district court (Keenan, J.) and the Second Circuit held that the terms of the reinsurance certificates there unambiguously capped the reinsurer's liability, and held in particular that expenses were grouped under the same limit of liability that governed damages. *Id.* at 913.

The court denied Home's motion, distinguishing *Bellafonte* from the case at bar. In a decision dated October 29, 1992, Judge Keenan noted in particular that the limit of liability under subparagraph (c), quoted above, applied only to ultimate net loss, which was unambiguously defined as excluding expenses and costs. Slip Op. at 7. Continuing, the court observed that by agreeing to follow the 1977 Interim Agreement and authorizing Aetna to cover expenses outside the limits of the Aetna policies, "Home may have become obligated to pay the expenses in addition to its [own] reinsurance limits." *Id.* at 9.

Subsequently, Aetna moved *in limine* to preclude Home from offering extrinsic evidence that the parties intended claims expenses to be included within the policy limits, and ultimate net loss in particular. Aetna relied upon the language of the summary judgment decision, in which the court observed that by the pre-printed terms of the reinsurance contracts expenses were plainly and unambiguously excluded from coverage. The court, however, denied Aetna' motion by decision dated September 14, 1993, holding that the endorsements to the 1973 and 1974 policies, as well as evidence that Aetna consistently billed Home on a cost-inclusive basis until 1984 were relevant to determining whether the parties had modified the reinsurance contracts. Slip Op. at 6, 7.

## DISCUSSION

Resolution of the instant case turns upon the question of who has the right to make the controlling interpretation of the Aetna excess policies generally, and of the liability for defense costs in particular. Aetna contends that its own good faith judgment that Robins' interpretation was a tenable one is dispositive as to Home's liability, because under reinsurance industry practice the reinsurance contracts obligated Home to follow Aetna's settlement. Home contends that it is not obligated to defer to Aetna's interpretation or to follow its settlements; rather, Home argues that the court is the proper arbiter of the meaning of the policies, based upon evidence of the parties' intent at the time the contracts were drafted and subsequently endorsed. In essence, Home maintains that this action is a simple contract dispute, in which it is entitled to avoid the settlement by proving that Aetna's interpretation of the contracts was at odds with the intent of the parties.

### I.

■ The starting point in this matter is the language of the Home reinsurance contracts themselves. When the intent of the parties to an insurance contract can be discerned from the plain language of the document, courts will give effect to that meaning. *See American Home Products Corp. v. Lib-*

*erty Mutual Ins. Co.,* 565 F.Supp. 1485, 1492 (S.D.N.Y.1983), *modified on other grounds,* 748 F.2d 760 (2d Cir.1984). Consequently, the court initially denied Home's motion for summary judgment on the ground that the pre-printed excess form policies (used by Home as the contracts of reinsurance) unambiguously excluded expenses from the policy limits. However, Home offered extrinsic evidence at trial to show that the parties agreed to modify the reinsurance contracts at the insistence of Aetna, such that claims expenses were included within ultimate net loss. *See Klock v. Lehman Bros. Kuhn Loeb Inc.,* 584 F.Supp. 210, 223 (S.D.N.Y.1984).

As this court has already discussed, Aetna's excess policies were cost-exclusive as originally written, whereas the underlying primary policies were cost-inclusive. Realizing that the exclusion of defense costs in the excess policies was inconsistent with the primary policies and left Robins with a gap in coverage, Aetna amended its 1973 and 1974 policies and prevailed upon its reinsurers, including Home, to amend the reinsurance contracts accordingly. Aetna secured the agreement of the reinsurers in this regard to preserve concurrency between the excess policies that it issued to Robins and the corresponding reinsurance contracts. Thus, it was the underwriting intent of the parties that both the Aetna excess policies and the related reinsurance policies be cost-inclusive—a fact that Judge Shea freely conceded. Record at 519; 537; 651–52. And, again as already discussed, the evidence at trial established that Aetna billed Home on a cost-inclusive basis for each of the policy years in question as its respective layers of reinsurance were pierced, working under the assumption that the Aetna policies and the reinsurance policies were cost-inclusive. Record at 570–71; 593; 639; 1313; 1391. Hence, to the extent that the 1973 and 1974 endorsements modified the reinsurance contracts of those years, and considering that all policies were billed on a cost-inclusive basis thereafter, it was the clear intention of the parties that costs be included within the monetary limits.

## II.

Home takes the position, that since the modification of the reinsurance contracts in 1973 (deleting the exclusion of costs from the definition of ultimate net loss) and the subsequent cost-inclusive billing signified an intent on the part of Aetna and Home to include defense costs within the policy limits, the mutual intent of Aetna and Home to that effect spells an end to the controversy. Home reasons, that although the definition of ultimate net loss in the *Aetna* policies might well have been finally determined to be cost-exclusive, thereby exposing *Aetna* to additional liability from the time it assumed a new obligation for expense costs in 1977, the intention of Aetna and its reinsurers to include costs within the liability limits is dispositive of Home's liability to Aetna.

Aetna insists, however, that Home's contractual obligation is not finally determined by reference to the parties' intent because rules of contract interpretation peculiar to the reinsurance industry supersede the construction that would ordinarily be placed upon a contract in light of the parties' underwriting intent. Specifically, although Aetna's witnesses conceded both parties intended their respective policies to be cost-inclusive, Aetna maintains, that because the loss provisions of the reinsurance policies were concurrent in scope with those of the *Aetna* policies, and since Judge Shea reasonably concluded that the scope of coverage at least arguably provided for the payment of defense costs in addition to the stated limits of liability, Home had no choice but to follow Aetna's settlement with Robins predicated upon that interpretation. Under Aetna's argument, the controlling interpretation of the reinsurance contracts between Aetna and Home is decided by operation of law, and the reinsurance principle known as "follow the settlements" in particular.

Resolution of this dispute requires that the court address two related, but distinct questions. First, the court must decide whether the Home reinsurance contracts were concurrent, or coextensive, with the Aetna policies. Second, if the answer to that question is affirmative, the court must determine whether the principle of "follow the settlements"

applies in this case in the way Aetna suggests.

### III.

The first task is to determine the type and scope of loss that was reinsured by Home. This issue is resolved by reference to the "following form" clauses in the policies of reinsurance. A "following form" clause in a policy of reinsurance incorporates by reference all the terms and conditions of the reinsured policy, except to the extent that the reinsurance contract by its own terms specifically defines the scope of coverage differently, i.e., via an exclusion. *See Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 762 F.Supp. 566, 594–95 (S.D.N.Y.1991) (*"Unigard I"*), *on certified question,* 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992), *aff'd in part, rev'd in part,* 4 F.3d 1049 (2d Cir.1993) (*"Unigard II"*). Put differently, in the absence of an explicit exclusion, the reinsurer by following form accepts the obligation to indemnify the ceding company for any loss it pays within the scope of coverage of the reinsured policy. Thus, if the Aetna policies provide for the payment of defense costs outside ultimate net loss, Home is obligated to reimburse Aetna for such payments *unless* the Home reinsurance contracts explicitly provide otherwise, e.g., by expressly including such costs within the definition of loss (which neither the Aetna nor the Home policies did), or by stipulating that costs were capped by an overall policy limit even if such costs were not part of the loss limitations (which the intermediaries' certificates did, but the Aetna and Home policies did not).

As the court has discussed *supra,* the purpose of following form is to achieve concurrency between the reinsured contract and the policy of reinsurance, thereby assuring the ceding company, that by purchasing reinsurance, it has covered the same risks by reinsurance that it has undertaken on behalf of the original insured under its own policy. Experts for both Aetna and Home agreed on this point, although expressing it differently, and concluded that in a reinsurance relationship, concurrency of coverage is presumed in the absence of contrary language in the rein-

surance contract. Record at 51–54 (Gilmartin, expert for Aetna); 1559 (Bentley, expert for Home). *See North River Ins. v. Philadelphia Reinsurance Corp.,* 831 F.Supp. 1132, 1143 (D.N.J.1993) (under following form clause, scope of coverage in reinsurance contract determined by terms and conditions of underlying reinsured policy except where reinsurance contract contains specific language to the contrary).

The Home reinsurance policies at issue possessed "following form" clauses. Item 3 of the Home reinsurance contracts for the 1972, 1973 and 1974 policy years states that the Home reinsurance contracts are "following the terms, conditions and limitations of the Aetna [Excess Insurance Policies]." Item 3 of the 1976 Home policy states that the policy "is following the terms, conditions, exclusions and limitations of the Aetna [Excess Insurance Policy]." As a result, whatever coverage the Aetna policies provided to Robins, the Home policies provided the same coverage by way of indemnity to Aetna, absent a contrary provision in the Home contract. *See* Record, Gilmartin at 51–54, Bentley at 1562–63.

### IV.

However, as the court has observed, the Aetna policies did not plainly establish how defense costs were to be paid. Accordingly, in determining that the policies did provide for defense costs as a supplemental benefit, Aetna could not bind the reinsurers to that settlement simply because the reinsurance contracts were following form with regard to the excess contracts; following form automatically binds a reinsurer to a settlement only where the claim is plainly and unambiguously within the scope of coverage provided by the reinsured policy, the terms and conditions of which coverage are incorporated by reference into the reinsurance policy. It remains, therefore, to determine what effect the reinsurance doctrine of "follow the fortunes," or more appropriately, "follow the settlements", (hereafter the "fol-

low the settlements doctrine") has upon the reinsurance contracts here at issue.[9]

The court must first explore the meaning of the doctrine in reinsurance law generally. Second, the court will address Home's claim that the "follow the settlements" doctrine is inapplicable in facultative reinsurance. Third, the court will examine Aetna's claim that the doctrine applies by operation of law, even in the absence of a loss settlements clause. Fourth, the court will discuss how the doctrine impacts Home's liability in light of the facts here at issue. Finally, the court will address Home's contention that, even if the follow the settlements doctrine were applicable to the reinsurance contracts here, Aetna is precluded from invoking the doctrine because its settlement with Robins was neither *bona fide* nor the product of a reasonable, businesslike investigation.

### A.

■■■■ The purpose of the follow the settlements doctrine is to prevent the reinsurer from "second-guessing" the settlement decisions of the ceding company. Absent such a rule, an insurance company would be obliged to litigate coverage disputes with its insured before paying any claims, lest it first settle and pay a claim, only to risk losing the benefit of reinsurance coverage when the reinsurer raises in court the same policy defenses that the original insurer might have raised against its insured. *See New York State Marine Ins. Co. v. Protection Ins. Co.*, 18 F.Cas. 160, 160–61 (C.C.Mass.1841) (Story, J.). This doctrine adjusts the incentives present in the reinsurance relationship in order to promote good faith settlements by the ceding company. Thus, where as to the relevant provision there is concurrency of coverage between the ceding company's policy and the policy of reinsurance, the follow the settlements doctrine imposes upon the reinsurer a contractual obligation to indemnify the ceding company for payments it makes pursuant to a loss settlement under its own policy, provided that such settlement is not fraudulent, collusive or otherwise made in bad faith, and provided further that the settlement is not an *ex gratia* payment.[10] *See Christiania General Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992). Assuming, therefore, that the settlement complies with the above described requirements, the reinsurer is no longer at liberty to raise policy defenses against the cedent that might have been raised by the cedent against its original insured. As the First Department stated in *Insurance Co. of New York v. Associated Mfrs. Mut. Fire Ins. Co.*[11]:

> What is claimed ... is that the [reinsurer] is not bound by the adjustment made by the [ceding company], but that, in order to entitle the [ceding company] to recover against [its reinsurer], it was required to prove every fact which the [insured] would have been required to prove, had the [ceding company] resisted its claim and an action been brought to recover under the original policy. We think that a proper construction of the contract of reinsurance fails to sustain this claim.... When, therefore, the plaintiff [ceding company] had ascertained by a proper investigation that it was legally liable to pay a certain amount to the [insured] under its contract, and such payment had been made, the defendant [reinsurer] could not question the validity of the [ceding company's] act, unless it alleged and proved that the plain-

---

9. The term "follow the fortunes" has been used imprecisely to describe the reinsurer's duty to follow the claims adjustment decisions of the ceding company, thereby giving rise to some ambiguity as to its meaning. "Follow the fortunes" more accurately describes the obligation to follow the reinsured's underwriting fortunes, whereas "follow the settlements" refers to the duty to follow the actions of the cedent in adjusting and settling claims. *See* "William C. Hoffman, *Common Law of Reinsurance Loss Settlement Clauses: A Comparative Analysis of the Judicial Rule Enforcing the Reinsurer's Contractual Obligation to Indemnify the Reinsured for Settlements*, 28 Tort & Ins.L.J. 659, 666–67 (1993)

(hereafter, Hoffman, *Common Law of Reinsurance Loss Settlement Clauses*)" (distinguishing original risk principle and duty to "follow the actions").

10. An *ex gratia* payment is one that is "made by one who recognizes no legal obligation to pay but who makes payment to avoid greater expenses as in the case of a settlement by an insurance company to avoid costs of a suit." BLACK'S LAW DICTIONARY 514 (5th ed. 1979).

11. 70 A.D. 69, 74 N.Y.S. 1038 (1st Dept.1902), *aff'd*, 174 N.Y. 541, 66 N.E. 1110 (1903).

tiff had acted fraudulently or collusively to its injury.

70 A.D. at 70–71, 74 N.Y.S. at 1039. Consequently, subject to the requirements of good faith and a reasonable, businesslike investigation, the ceding company may bind the reinsurer to follow its settlement fortunes when it concedes that a particular claim falls within the scope of coverage provided by the ceding company's policy. And as the Second Circuit pronounced in *Bellafonte:*

> The doctrine of "follow the fortunes" has been defined as meaning that "the reinsurer will follow the fortunes or be placed in the position of the [insurer]." Koehnen, "Administration and Maintenance of Business in Force," Reinsurance 509 (Strain ed. 1980); *see also* Kramer, "The Nature of Reinsurance," Reinsurance, *supra,* at 11–12 (reinsurer shall "follow the fortunes" of the insured as if the reinsurer were a party to the original insurance). Basically, the doctrine burdens the reinsurer with those risks which the direct insurer bears under the direct insurer's policy covering the original insured. *American Ins. Co. v. North American Co. for Property and Casualty Ins.,* 697 F.2d 79, 81 (2d Cir.1982) ("AIC"); *see also* Gerathewohl, 1 Reinsurance Principles and Practice, 466 (1980).

903 F.2d at 912.

This is not to say that the reinsurer is bound to follow all settlements of the ceding company. No such obligation would exist, for example, if the ceding company were to pay a loss that was categorically outside the scope of coverage; such a settlement might make good business sense to the cedent, but it would not trigger a duty on the part of the reinsurer. *See North River Ins. v. Philadelphia Reinsurance Corp.,* 831 F.Supp. 1132, 1142 (D.N.J.1993). Rather, the reinsurer may only be bound to follow the interpretation placed by the ceding company on its own policy when the settlement proceeds from a *reasonable* judgment on the part of the ceding company that the insured's interpretation of the scope of coverage is meritorious. In *Mentor Ins. Co. v. Norges Brannkasse,* the Second Circuit appositely wrote:

> The follow-the-fortunes [or follow-the-settlements] principle does not change the reinsurance contract; *it simply requires payment where the cedent's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured.*

996 F.2d 506, 517 (2d Cir.1993) (emphasis added). Thus, assuming concurrency of coverage, when a ceding company enters into a settlement that is grounded on a reasonable interpretation of its own policy, the reinsurer may not avoid liability by raising policy defenses and objections that were available to the cedent; the court's review is limited to deciding whether the ceding company, through a reasonable and businesslike inquiry, concluded that the claim was arguably covered, and hence properly one to be settled. It is only when the ceding company pays a claim that is *manifestly* outside the scope of the cedent's policy coverage that the reinsurer may successfully challenge the ceding company's interpretation and avoid the obligation to follow its settlement fortunes. *See Christiania, supra,* 979 F.2d at 280 ("under the 'follow the fortunes' doctrine, a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. A reinsurer cannot second guess the good faith liability decisions made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled") (citations omitted).

## B.

■ Home argues that the follow the settlements doctrine is inapplicable to facultative reinsurance, as opposed to treaty reinsurance. For this proposition, Home relies upon the expert testimony of Bentley (Record at 1483), as well as the statements of certain authors in the field.[12]

Aetna contends that the doctrine is not limited in its application to treaty reinsurance, and offered the expert testimony of Gilmartin to show that the doctrine was custom and practice within the industry general-

---

**12.** Golding, *The Law and Practice of Reinsurance* 69 (1987); Hammesfahr & Wright, *The Law of* *Reinsurance Claims* 129–30 (1994); Staring, *Law of Reinsurance,* § 18.8 at 28 (1993).

ly. Record at 106–07. Aetna disputes the accuracy of the publications upon which Home relies and identifies countervailing authority. *See* 1 Klaus Gerathewohl, *Reinsurance Principles and Practice* 467 (1980) (hereafter, "Gerathewohl") ("Contrary to the views sometimes expressed in the literature, the follow-the-fortunes principle applies to all forms of reinsurance treaties and not just to proportional reinsurance treaties."); Hoffman, *Common Law of Reinsurance Loss Settlement Clauses* at 668 (American courts apply doctrine to all types of reinsurance).

The court agrees with Aetna. In the first place, at no point did Home articulate *why* the distinction between facultative reinsurance and treaty reinsurance should be meaningful when considering the applicability of the follow the fortunes/settlements doctrine. Indeed, Home's own expert, Bentley, conceded that Home could be required under the doctrine to follow Aetna's settlements here, i.e., provided that such settlements were reasonable, made in good faith, and preceded by notice to the reinsurers. Record at 1564–69.[13] Further, the New York Court of Appeals recently discussed the application of the doctrine under a facultative reinsurance certificate in *Unigard,* 79 N.Y.2d 576, 583, 584 N.Y.S.2d 290, 293 & n. 2, 594 N.E.2d 571, 574 (1992). *See also Bellefonte,* 903 F.2d at 910. In view of the foregoing, the court holds that the follow the settlements doctrine is applicable to the field of facultative reinsurance as well as to treaty reinsurance.

### C.

Home's strongest argument posits, that even if the follow the settlements doctrine

applies in facultative reinsurance generally, it can have no application in this case because the contracts of reinsurance here do not contain a standard "follow the fortunes" or loss settlement clause. Unlike the following form clauses quoted in Part III, *supra,* the usual language of a loss settlement clause is not to be found upon examination of the Home reinsurance contracts.[14]

Initially, Aetna responds that loss settlement language is, indeed, present in the Home reinsurance contracts, as evidenced by the following form clause and other language in the contracts. In the alternative, Aetna argues, that even if this court were to find the reinsurance contracts here to be devoid of traditional loss settlements clauses, the follow the settlements doctrine is nevertheless applicable in the absence of those clauses by operation of law, i.e., due to the long standing custom and business practice of the reinsurance industry.

As to the first argument, Aetna has not persuaded the court that the presence of the word "follow", read in isolation wherever it may appear, must be construed as the functional equivalent of a loss settlement, or "follow the fortunes", clause. Nor can the phrase, "[t]his Policy is *subject to* the same warranties, terms and conditions ... as are contained in ... the Underlying Coverage" be similarly interpreted as a stipulation that the reinsurer will be bound by the settlements of the ceding company. *See* Plaintiff's Exhibit 15. Such an interpretation would abolish the important distinction between the function of following form clauses

---

**13.** Bentley later opined that the Home contracts were partly excess insurance policies rather than purely reinsurance of the Aetna excess policies. Record at 1572–75. The court rejects Bentley's characterization of the Home policies; although issued on excess policy forms, the Home contracts were reinsurance policies.

**14.** In cases where such a clause was present, it typically recited that settlements pursuant to the underlying insurance are binding on the reinsurer. *See, e.g., Bellefonte,* 903 F.2d at 911 ("[a]ll claims involving this reinsurance, when settled by the Company, shall be binding upon the Reinsurer, which shall be bound to pay its proportion of such settlements, and in addition thereto, in

the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportion of expenses ..."). It is to be noted that the certificate containing the above quoted clause was the same certificate used in the case at bar, which certificate was superseded by the Home reinsurance policies. *See also Unigard, supra,* 584 N.Y.S.2d at 293 & n. 2, 594 N.E.2d at 574 & n. 2 ("[a]ll claims covered by this reinsurance *when settled by the Company shall be binding on the Reinsurers, who shall be bound to pay their proportion of such settlements.")* (emphasis in original); *North River Ins. v. Philadelphia Reinsurance Corp., supra,* 831 F.Supp. at 1142 (similar).

and follow the settlements clauses. *See North River, supra,* 831 F.Supp. at 1143 (coverage under "follow the fortunes/settlements" is broader than "following form"). Following form simply obliges the reinsurer to indemnify the ceding company fully within the scope of the reinsured risk when the claim falls within the scope of that risk as a matter of law (subject to exclusions explicitly delineated within the certificate of reinsurance); the follow the fortunes/settlements doctrine vests in the ceding company the right to decide what the scope of coverage actually is when the cedent's policy is subject to more than one reasonable interpretation, and to make adjustments and settlements in conformity with its interpretation. Therefore, Home's obligation to follow Aetna's loss settlement does not arise pursuant to a traditional loss settlement clause; the form excess policies which Home used as reinsurance contracts were simply not designed for that task and, not surprisingly, did not have loss settlements clauses printed on those forms.

■ Aetna's second contention is the sounder one. Under Aetna's theory, it is the settled custom and practice in the reinsurance industry that reinsurers follow settlements entered into between a ceding company and its insured, as long as the settlements are made in good faith after a reasonable investigation and do not involve *ex gratia* payments. Essentially, Aetna maintains that a reinsurer's undertaking to follow the ceding company's settlements is implicit in any contract of reinsurance, and enforceable even in the absence of an explicit loss settlements clause. Home responds that in the absence of a loss settlements clause, a reinsurer is not bound by a ceding company's settlement of a coverage dispute without the consent of the reinsurer. The court agrees with Aetna.

The weight of authority appears to favor Aetna's position, although the authorities admittedly do not speak with one voice. For example, Gerathewohl opines that the "fundamental follow-the-fortunes principle" generally applies irrespective of whether it is expressed in the contract of reinsurance, i.e., in a loss settlement clause. *See* Gerathewohl, *supra,* § 2.5.1. at 466. *See also* Henry T. Kramer, *The Nature of Reinsurance, in*

*Reinsurance* 11–12 (Strain ed. 1980) (duty to follow fortunes "may or may not be expressed in an agreement of reinsurance but nevertheless exists for all"). *Contra* Graydon Staring, *Law of Reinsurance,* § 18.8 at 28 (1993) ("[w]ithout a follow the fortunes clause, the reinsurer will probably not be bound, . . . by a settlement of a claim without its consent."); Hoffman, *Common Law of Reinsurance Loss Settlement Clauses, supra,* at 679 (split of authority).

■ The existence of an industry custom, such as the duty to follow loss settlements, is in the first instance a question of fact. *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse,* 996 F.2d 506, 513 (2d Cir.1993). Aetna's expert witness, Gilmartin, testified as follows:

A: The phrase "follow the fortunes" is casually used in the business to refer to a number of obligations or possible obligations of a reinsurer.

One of them taken to its extreme says that the reinsurer has to follow even though it is a business risk. Because of that decision the language has, by and large, been dropped out of reinsurance contracts, and you rarely see the phrase in a reinsurance contract any more, following the fortunes, but the concept persists, and follow the fortunes simply says whatever the ceding company does in the way of underwriting or in settlement of claims, you are obliged to follow.

When you get to facultative reinsurance, follow the fortunes principle doesn't apply to underwriting, but it still does apply to loss settlement.

So follow the loss *settlements* is more or less part of the concept, the overall concept of follow the fortunes. But [follow the underwriting fortunes] doesn't apply here. All that applies here is follow the loss settlements, and—

THE COURT: Follow the what?

THE WITNESS: The loss settlements. Whatever good-faith loss settlements the ceding company makes binds the reinsurer. That is both a matter of custom and practice and, I understand, of law. . . .

Q: Do you have to have specific language to evoke the concept of following?

A: *No. It is inherent in the transaction of reinsurance, in the relationship* but it's here. Doesn't have to be here, but it is here.

Record at 106–107 (emphasis added).

Gilmartin's testimony on this point is pivotal and the court gives it great weight. It would be difficult to imagine how reinsurance transactions could function in the absence of such an undertaking, given such large covers as were written in this case. Significantly too, in the face of Aetna's evidence on this critical point, Home did not adduce contrary evidence in rebuttal of sufficient weight or precision, either through its own experts or otherwise.

Bentley, Home's expert on reinsurance, did testify that the operation of the loss settlements principle is conditioned upon the ceding company's giving the reinsurers timely notice and information before the event, (Record at 1569), as well as the prerequisite that the term or condition of the reinsured policy be concurrent with, i.e., not excluded or varied by, the policy of reinsurance, (Record at 1578), but did not otherwise deny that the follow the settlements doctrine was customary in the reinsurance industry. Bentley further agreed that a reinsurer might be bound by a settlement with which it did not agree, unless it were determined by a court that the payment made by the ceding company was not, as a matter of law, even arguably within the scope of coverage. This point was elicited in a light, but revealing moment:

Q: What if [the reinsurer] was advised of the circumstances but disagrees and does not go along with the settlement?

A: Then they have grounds for debate.

Q: And in fact that's why we are here.

THE COURT: Who would win the debate?

MR. NICOLETTI: That's why you are here.

Record at 1593.

Although Bentley denied that the loss settlements principle applies in the context of excess of loss reinsurance, as opposed to proportional reinsurance, he failed to establish why the distinction should be important, and the court rejects Bentley's testimony on this point.

In view of the evidence, the court finds that it is customary within the reinsurance industry for reinsurers to follow the claim settlement decisions of the ceding company even in the absence of an explicit loss settlements clause. In view of the court's conclusion on this point, it remains only to decide whether Aetna's decision (i.e., that Robins' claim was supported by a permissible interpretation of the Aetna policies) was reached in the course of a businesslike investigation, and was made in good faith. If the answer to both questions is affirmative, then Aetna's settlement with Robins will be binding upon Home.[15]

**D.**

As observed earlier, after reviewing the definition of ultimate net loss in each of the Aetna policies for the relevant policy years, Judge Shea determined that said definitions, literally read, unambiguously excluded defense costs—which costs had been undertaken by Aetna in the 1977 Interim Agreement. Relative to the 1972 and 1976 policy years in particular, Shea arrived at the conclusion that the Robins interpretation was plainly supported by the policy language. As to the 1973 and 1974 policy years, Shea considered the matter open to debate at the time he was negotiating the settlement, *viz.*, because it was more likely than not that Aetna would prove during the coverage litigation that the

---

**15.** The court takes note that the issue of whether the duty to follow loss settlements exists in the absence of explicit language to that effect has been reached by at least one other court and resolved in the affirmative. *See International Surplus Ins. v. Underwriters at Lloyd,* 868 F.Supp. 917, 920 (S.D.Ohio 1994) (*"ISLIC"*). Home strenuously urges that *ISLIC* was incorrectly decided, and suggests that the authority upon which it relied does not support its holding.

Letter of Frank M. Nicoletti, Esq., dated October 27, 1994. In particular, Home argues that the *ISLIC* case's reliance upon the decision in *Mentor, supra,* is misplaced, for although the special master in *Mentor* stated that following loss settlements was customary, the reinsurance contracts there contained loss settlements clauses. 996 F.2d at 510, 516. Be that as it may, *it is the evidence in this case, and not the ISLIC holding,* that forms the basis of this court's decision.

excess policies had been modified by the 1973 endorsements, deleting the exclusion of defense costs from the definition of ultimate net loss, and thereby establishing the intent of the parties to render those policies cost-inclusive. However, the failure of Aetna explicitly to include such costs within the loss limitations rendered a victory even on the 1973 and 1974 policies less than certain. Accordingly, as to all four policy years in question, to the extent that Robins argued defense costs were owed as a supplemental benefit, outside the loss limitations, Shea concluded that Robins' had a meritorious, albeit debatable, claim.

■ Shea's determination was a reasonable one, based upon established rules of contract construction. Although he did not have the benefit of 20/20 hindsight that a full trial on the merits would afford, as claims counsel he was charged with the responsibility of rendering legal advice to the highest levels of Aetna management. It should be recalled that the specific purpose of an ultimate net loss clause in an insurance contract is to determine whether claims expenses are to be allocated pro rata according to the reinsurer's share of loss, or whether such expenses are to be included within ultimate net loss and, therefore, the loss limitations. *See* Robert F. Salm, "Reinsurance Contract Wording," in Reinsurance 104–05 (Strain ed. 1980). In view of the unambiguous language of the 1972 and 1976 policies, there would seem to be scant support for any argument by Aetna against its insured that defense costs were governed by the loss limitations; thus, as to these policy years, Aetna reasonably determined that those policies were at least arguably, if not probably, cost-supplemental. Regarding the 1973 and 1974 policies, although there was evidence of a modification which would tend to prove an intent to render the policies cost-inclusive, Shea's forecast of victory in the coverage litigation was

not unqualified; the language that remained, i.e., following the deletion of defense costs from the original definition of ultimate net loss, did not on its face include expenses within the loss limitations but continued to define ultimate net loss as those sums payable as damages.[16]

■ The reasoning that undergirds the "follow the settlements" doctrine does not require that a ceding company pursue every defense in litigation against the insured, however close a call the particular policy defense might be. Quite the contrary: subject to the ceding company's duty of utmost good faith, and the requirement that investigations such as the one conducted by Shea be reasonable and businesslike, the doctrine leaves it to the ceding company to make the settlement decision in the first instance, which settlement is then binding upon the reinsurers. Although this court has ultimately found that all policies were intended to be cost-inclusive, at least as of 1973, that finding does not change the result here; rather, it is the reasonableness of Aetna's interpretation of the scope of coverage at the time of the settlement that is dispositive of the reinsurers' obligation to the reinsured.

### E.

■ Home maintains, however, that the settlement between Robins and Aetna was tainted by bad faith. Home highlights the adjustments made by Shea to the total value of the settlement in consideration of the "Minnesota Problem", as well as the fact that between 1983 and the finalization of the settlement in 1984, Aetna increased the amount of the settlement by approximately $11 million, from $59 million to $70 million. Additionally, Home points out that Aetna provided an additional $350 million in coverage to Robins to settle conspiracy claims against Aetna in a separate class action suit.[17]

16. It is not insignificant that the Examiner in Bankruptcy Court, the highly regarded former Bankruptcy Judge, Ralph Mabey, came to the same conclusion. "Starting in 1971, arguably none of the excess policies contained a duty to defend, and all policies quite clearly excluded defense costs from their limits.... The 1977 Interim Agreement, however, significantly changed Aetna's responsibilities. The very provi-

sions that had minimized coverage, when read in conjunction with the 1977 Interim Agreement, maximized coverage." Plaintiff's Exhibit 39, at 20–21.

17. Several months following the Chapter 11 filing, seven Dalkon Shield plaintiffs had filed a class action suit against Aetna alone, alleging that Aetna had become an active participant in

Home considers the above referenced settlement measures suspicious and urges that it is accordingly relieved of any duty to follow loss settlements that are made in bad faith and without proper businesslike investigation. *See American Marine Ins. Group v. Neptunia Ins. Co.,* 775 F.Supp. 703, 709 (S.D.N.Y.1991), *aff'd without opinion,* 961 F.2d 372 (2d Cir.1992).

Aetna responds that the Examiner in Bankruptcy Court carefully reviewed the 1984 settlement within the context of the *Breland* class action suit against Aetna and found that the agreement was not tainted by misconduct. To the extent that Home attributes bad faith in the 1984 settlement arising from the *Breland* action, Aetna further highlights the statement of the Fourth Circuit that the record in that case was "devoid of any evidence of any wrongful conduct on Aetna's part ..." 880 F.2d at 752.

Home disputes the value of the Examiner's finding, pointing out that at no point did the Examiner have occasion to review the *bona fides* of the settlement from the point of view of the reinsurers; Mabey was concerned predominantly with allegations of collusion between Aetna and Robins to prejudice the interests of the claimants.

The court agrees with Home that the Examiner's conclusions, as ultimately affirmed by the Fourth Circuit, are not conclusive on the issue of Aetna's good faith in the instant proceeding; at no juncture did Mabey have occasion to focus on the relationship between Aetna and the reinsurers. The favorable findings in the bankruptcy proceeding do, however, undermine Home's suggestion that Aetna was in some way protecting its own interests due to the conspiracy claims in the *Breland* action; the district court (Merhige, J.) and the Fourth Circuit found those claims to be without evidentiary support. *See In Re A.H. Robins Co., Inc.,* 88 B.R. 755, 762–63 (E.D.Va.1988), *aff'd,* 880 F.2d 694 (4th Cir.),

developing, testing, and marketing the IUD, and had conspired to suppress information tending to show that the IUD was hazardous. *See In Re A.H. Robins Co., Inc.,* 880 F.2d 709, 717 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (the *Breland* action). Aetna settled the *Breland* action as part of the Robins bankruptcy proceeding. *Id.* at 721.

*cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989).

Moreover, the record does not otherwise support Home's charge that the settlement was tainted by collusion or bad faith. Significantly, neither the sums attributable to the "Minnesota Problem" nor the additional $11 million that was added to the original figure of $59 million were passed on to the reinsurers as part of their share in the settlement. Moreover, Hilton admitted that he had no factual basis on which to conclude that Aetna acted in bad faith. Record at 1228. Instead, Home seeks to base a finding of bad faith on communications between Aetna and Robins which are not in evidence. The court is not prepared to draw such an inference. Accordingly, the court finds no evidence of a breach by Aetna of its duty of *uberrima fides* in the conduct of its settlement with Robins.

## V.

Home additionally seeks to defeat the operation of the follow the settlements doctrine by pressing its claim for reformation of the policies. Home points out, and Aetna does not dispute, that the intent of the parties in endorsing the reinsurance contracts in 1973 was to make the policies cost-inclusive. Further, Home points to Aetna's consistent practice of billing Home on a cost-inclusive basis, i.e., until the conclusion of the October 31, 1984 settlement agreement between Aetna and Robins.[18] Thus, Home urges, that given the mutual mistake of Aetna and Home in failing to adopt policy language that clearly evidenced an intention to capture claims expenses within the limits, the remedy of reformation is appropriate under ordinary principles of contract construction. *See Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co.,* 18 F.Supp. 720 (S.D.N.Y.), *aff'd,* 91 F.2d 964 (2d Cir.1937).

18. After the 1984 settlement agreement, Aetna billed Home on a cost-supplemental basis, reflecting its conclusion that, due to the settlement, it was bound to pay defense costs as a benefit supplemental to the loss limitations.

The court declines to grant the remedy Home seeks, for reformation would be futile. In essence, Home seeks retroactively to nullify the effect of the settlement upon Home, where the settlement proceeded from a reasonable interpretation of the excess policies, by amending the critical language *nunc pro tunc.* The point of the follow the settlements doctrine, however, is to empower the ceding company to make a settlement based upon policy language existing *at the time of the settlement,* i.e., without the benefit of coverage litigation which might conclusively establish the meaning of a given clause in the contract, which settlement is immediately binding upon the reinsurer in the absence of fraud, collusion or an *ex gratia* payment. Accordingly, although the defective language of the ultimate net loss clauses proceeded from a mutual mistake, the court must decline to reform the reinsurance contracts.

## VI.

At this juncture, the court addresses two contentions raised by Home relative to the calculation of Aetna's damages. First, Home argues that Aetna has failed to prove its damages because it did not identify the expenses that directly relate to those claims that were paid by Aetna and reinsured by Home within the layer in which Home participated as a reinsurer. Second, Home takes issue with Aetna's claim for prejudgment statutory interest. The court will address each issue in turn.

### A.

■ Aetna's calculation of its damages (i.e., Home's unpaid share of defense costs) begins by dividing the reinsurer's indemnity payment by the gross excess policy payment. The resulting ratio is then multiplied against the total of all expenses paid by Aetna on the relevant excess policy. Thus, although Home is billed according to its share of Aetna's indemnity payments as those payments pierce and later exhaust the particular layer in which it participates, for expense purposes the billing is different: Home is billed not according to the pro rata share of the particular layer in which it participates, but according to the total percentage of its partic-ipation in the policy year. Aetna's expert on reinsurance accounting, Rees, testified that such a pro rata formula is accepted practice in billing expenses to reinsurers, and in particular where under a facultative certificate the expenses are a supplemental benefit in addition to loss. Record at 560.

According to Home, if the expenses were properly payable on a cost-supplemental basis, the reinsurer's liability should consist of the sums paid in damages for claims that actually impact the layer in which it participated as a reinsurer and the connected expense payments. Continuing, Home maintains that the pro rata formula advanced by Aetna is imprecise because it does not take into account the possibility that expenses in one layer might be disproportionately larger or smaller than those in another. Home relies upon the testimony of its expert witness, who stated that by the layering of reinsurance the Home policies were excess of loss facultative reinsurance rather than proportional reinsurance.

Nevertheless, the preponderance of the evidence favors Aetna's methodology. In fact, the Clough certificates themselves had provided explicitly for pro rata billing of claims expenses. Plaintiff's Exhibit 6. Nor did Home's expert demonstrate that reinsurance billing on a cost-supplemental basis is generally conducted differently from the manner in which Rees described it. Consequently, the court adopts Aetna's computation of damages.

### B.

■ Aetna claims prejudgment interest in conformity with New York Civil Practice Law and Rules § 5001 which provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract...." Interest is computed from the "earliest ascertainable date the cause of action existed." *Id.* Here, the accrual of Aetna's cause of action can be identified as maturing when Home failed to comply with Aetna's demand that it indemnify Aetna for payments made in connection with its settlement with Robins.

The settlement with Robins was concluded on October 31, 1984. On December 2, 1985 Aetna made a demand to Home for immediate indemnification of expenses, in addition to damages, for all but the 1976 policy years.[19] Home did not comply with Aetna's request. Thus, Aetna seeks prejudgment interest from the time of anticipatory breach, running from January 1, 1986, upon the sum of $4,199,249, representing Home's share of expenses for the 1972, 1973, 1974 and 1976 policy years. Plaintiff's Exhibit 59.

Home initially responds that Aetna did not prove when the Home reinsurance layers were exhausted, and advances further that some part of the Aetna excess policies was not paid into the Robins estate until December 1989. The first statement is inaccurate, as demonstrated above. As to the 1976 year, Aetna was entitled to regard the nonpayment of expenses relating to the earlier policy years as an anticipatory repudiation of any outstanding obligation of the same kind. *See Board of Educ., Yonkers City School Dist. v. CNA Ins. Co.*, 647 F.Supp. 1495, 1507 (S.D.N.Y.1986), *aff'd*, 839 F.2d 14 (2d Cir. 1988). Thus, the court awards Aetna prejudgment interest accruing from January 1, 1986.

## VII.

Finally, pursuant to Count One of Aetna's amended complaint, Aetna seeks declaratory judgment as to Home's liability to indemnify Aetna for payments pursuant to the 1970 policy year. According to Bennett, the Dalkon Shield claimants trust has not yet determined that claims from the 1970 policy year have exhausted the policy. Record at 365–70. Thus, although the policy has been in play, a bill has yet to be finalized for the reinsurers.

The trial submissions are not particularly clear concerning Aetna's claim for declaratory relief in connection with the 1970 policy year. As a starting point, however, with regard to the 1970 excess policy, whatever effect the 1977 Interim Agreement had for the other policies, it had here: a duty to defend was undertaken and became binding upon Home, whose contract of reinsurance had previously been drafted on a cost-exclusive basis. Nevertheless, a different result is compelled regarding the coverage of defense costs. Although the 1977 Interim Agreement created a duty to defend Robins, and was made binding upon Home by virtue of its undertaking to follow the agreement, in the 1970 policy year (unlike the other years) defense costs were unambiguously *included* within *Aetna's* definition of ultimate net loss. Because the Home policies are construed as providing the same terms as were contained in the Aetna policies, *viz.*, by following form, the 1970 Home policy was, by tracking the 1970 Aetna policy, cost-inclusive. This conclusion is compelled by the language of the 1970 Aetna policy. *See* Plaintiff's Exhibit 1 at page 6, ¶ 4.13 (" 'ultimate net loss' means the total of all damages and expenses"). As a result, it would be impossible for Aetna to argue, as it did with regard to the other policy years, that defense costs were payable under the 1970 policy as a supplemental benefit. Thus, Home is liable under its contract of reinsurance to indemnify Aetna for claims under the 1970 policy year, but only on a cost-inclusive basis.

## CONCLUSION

With regard to the 1972, 1973, 1974 and 1976 policy years, Aetna shall recover the sum of $4,199,249, together with prejudgment interest at the New York statutory rate accruing from January 1, 1986. As to the 1970 policy year, declaratory judgment shall be entered consistent with this opinion in favor of Aetna.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

19. As of that date, for the policy years 1972, 1973 and 1974 the layers in which Home had participated as a reinsurer had been exhausted; thus, liability for expenses had already matured. Repeated collection requests had gone unanswered.

Home had yet to receive a collection request for its 10% participation in the 1976 policy year, $20 million excess of $25 million layer. Plaintiff's Exhibit 41 (letter of R.B. Smith to James Dulig [sic] dated December 2, 1985).