(December 27, 2007)

■ GRANITE STATE INSURANCE COMPANY et al., Respondents, v ACE AMERICAN REINSURANCE COMPANY, Fomerly Known as INA

Reinsurance Company, Now Known as R & Q Reinsurance, Appellant. [849 NYS2d 201]—

Order, Supreme Court, New York County (Richard B. Lowe, III, J.), entered March 2, 2007, which, to the extent appealed from, denied defendant's renewed cross motion for summary judgment dismissing the fourth cause of action, unanimously affirmed, without costs. Appeals from order, same court and Justice, entered December 20, 2006, granting plaintiffs summary judgment on their first, second, third, and fifth causes of action, and judgment entered thereon on December 21, 2006, unanimously withdrawn pursuant to the parties' stipulation dated November 8, 2007.

As pertinent to this appeal, it is undisputed that plaintiffs, subsidiaries of American International Group (collectively known as AIG), issued excess umbrella liability policies to Castle & Cooke, Inc. (later known as Dole Foods Company), and then purchased facultative contracts of reinsurance from defendant, ACE American Reinsurance Company. Pursuant to these policies, ACE agreed to indemnify and promptly reimburse AIG, following receipt of proof of loss, an agreed part of any amounts that AIG paid under the insurance policies for which it purchased reinsurance.

In the early 1990s, Castle & Cooke was sued by thousands of its field workers in Central America and the Philippines for injuries allegedly suffered by them as a result of their exposure to the pesticide dibromochloropropane (commonly referred to as DBCP). Castle & Cooke then tendered claims to its insurers. Of the seven policies issued by AIG, ACE reinsured only one, a policy that had been issued by Granite State in 1979. In 1993, AIG, after consulting with counsel, disclaimed coverage based on its belief that the Granite State policy issued to Castle & Cooke did not provide coverage for Castle & Cooke's claim. According to ACE, Castle & Cooke accepted such disclaimer. Castle & Cooke then entered into a future cost agreement (FCA) with certain AIG companies, effective June 1, 1996, setting forth

which policies would provide defense and indemnity on the Castle & Cooke claims on an ongoing basis.

AIG thereafter realized that it had paid more than the available limits with respect to defense expense and indemnity on one of its National Union policies issued to Castle & Cooke, a policy that ACE had not reinsured. Counsel on coverage matters advised AIG by letter dated May 19, 1997 to move its National Union overpayments to the Insurance Company of the State of Pennsylvania, which ACE also did not reinsure. In September 1997, AIG asked coverage counsel to see if it could correct its error by instead charging the overpayments to the Granite State policy that was reinsured by ACE. Then, after AIG asked Castle & Cooke if it would accept payments under the Granite State policy, AIG and Castle & Cooke added an addendum to the FCA, dated April 13, 1998, which provided that AIG had exhausted the applicable limits of its National Union policy and, "to the extent any sums remain unpaid, they shall become the responsibility of Granite State."

On February 21, 1998, AIG sent ACE a notice of loss based on the payments to Castle & Cooke that it had reallocated to the Granite State policy. ACE responded by letter dated March 4, 1998, stating that the first reinsurance notice of loss was dated February 21, 1998 and that "[t]here was no useful narrative on the Notice. Please appreciate the claim having an exposure of $500,000 should be accompanied by something on which we can use [sic]. Unfortunately we cannot consider the First Notice as being sufficient to avoid prejudice under the Cert. Could you please pass these advises along with our request for narrative." In its response dated May 8, 1998, AIG asserted that Castle & Cooke was facing 26,000 lawsuits in many states and foreign countries resulting from alleged exposure to pesticides and that once AIG determined that the National Union policy was exhausted, the FCA was amended by endorsement to replace the National Union policy with the Granite State policy. The letter did not explain how AIG moved around its losses in order to charge them to the Granite State policy.

By letter dated May 21, 1998, ACE maintained that it could not understand the basis for the claims, based on AIG's failure to detail its billings, and requested further information with respect to AIG's claims, including Castle & Cooke's damages, AIG's determination and resolution of any coverage issues, the basis for any settlement by AIG, and the rationale for AIG's decision to cede the claims to the Granite State policy. ACE maintains that, despite repeated requests, AIG never provided most of the requested information.

The purpose of the "follow the fortunes" or "follow the settlements" doctrine in reinsurance law is to prevent the reinsurer from "second-guessing" the settlement decisions of the ceding company (*Aetna Cas. and Sur. Co. v Home Ins. Co.*, 882 F Supp 1328, 1346 [SD NY 1995]), in this case, AIG. Thus, where there is concurrency of coverage between the ceding company's policy and the policy of reinsurance, the doctrine imposes a contractual obligation upon the reinsurer to indemnify the ceding company for payments it makes pursuant to a loss settlement under its own policy, provided that such settlement is not fraudulent, collusive or otherwise made in bad faith, and provided further that the settlement is not an ex gratia payment, i.e., one made by a party that recognizes no legal obligation to pay, but makes payment to avoid greater expense, as in the case of a settlement by an insurance company to avoid the cost of a suit (*id.*). The "follow the fortunes" doctrine requires payment where the cedent's good faith payment is at least arguably within the scope of the insurance coverage that was reinsured, and a reinsurer cannot second-guess the good faith liability decisions made by its reinsured or the reinsured's good faith decision to waive defenses to which it may be entitled (*id.* at 1347).

ACE now contends that the Commercial Division erred in denying its cross motion for summary judgment on the Castle & Cooke claim since, after discovery was completed with respect to such claim, there was no question that AIG made an ex gratia payment that was not covered by the reinsurance contract. It maintains that the court misunderstood the "follow the fortunes" doctrine in conflating two exceptions to the rule, bad faith and ex gratia payment, and erroneously required it to prove bad faith by AIG in ceding the Castle & Cooke claim to the Granite State policy.

However, rather than conflating the two exceptions, it appears that the motion court merely decided that there were questions of fact with regard to the bad faith issue and did not reach the ex gratia payment issue. Nevertheless, it properly denied ACE's cross motion on the Castle & Cooke claim.

AIG initially disclaimed coverage on the Granite State policy based on the DBCP exclusion, and ACE maintains that Castle & Cooke then settled with AIG and agreed that the Granite State policy did not provide coverage. Moreover, the FCA, while listing the parties as "AIG Member Companies, including National Union Fire Insurance Company and The Insurance Company of the State of Pennsylvania," and specifically noting that AIU Insurance Company was not included as an AIG member company for purposes of the agreement, makes no men-

tion of Granite State. It also appears that AIG made a mistake in calculating how its payments to Castle & Cooke had exhausted a different AIG policy; that AIG's coverage counsel initially determined that the mistake should be corrected by allocating payments to the Insurance Company of the State of Pennsylvania policy, not the Granite State policy; and that years after its initial disclaimer of coverage and the settlement agreement, AIG reversed its coverage position and asked Castle & Cooke to accept payments under the Granite State policy. Thus, given the foregoing, as well as the question whether the FCA affirmatively excluded the Granite State policy and therefore rendered any future payment under that policy ex gratia, as ACE contends, or whether the FCA, which designated certain policies that were expected to make the initial payments toward Castle & Cooke's defense costs, could be amended to include other policies upon the exhaustion of the initial policies, as AIG contends, issues of fact exist with respect to the applicability of both the bad faith and the ex gratia payment exceptions to the "follow the fortunes" doctrine, requiring resolution by the trier of fact. Concur—Lippman, P.J., Andrias, Nardelli, Gonzalez and Kavanagh, JJ.