■ American Home Assurance Company et al., Plaintiffs and National Union Fire Insurance Company of Pittsburgh,

PA., Appellant, v EVEREST REINSURANCE COMPANY, Respondent, et al., Defendant. [936 NYS2d 20]—

In 1993, National Union and its affiliates settled massive coverage litigation arising from the underlying insured's manufacture of the contaminant polychlorinated biphenyl (PCB) continuously from 1929 to 1971 at 80 sites around the country (the 1993 settlement). The 1993 settlement agreement had two parts: a cash payment to resolve all existing and future governmental clean-up claims at the 80 sites, and an agreement as to how any future private bodily injury or property damage claims at those sites would be handled. Several years after the 1993 settlement was consummated, the underlying insured became subject to claims for bodily injury and property damage arising from PCB contamination in and around Anniston, Alabama, where the insured had a manufacturing facility. In 2004, the insured settled the Anniston litigation for $600 million, and presented a claim for $150 million to National Union and its affiliates. The insurers paid the loss and turned to their reinsurers for reimbursement. When Everest (and three others that have now settled) refused to pay, the insurers commenced this action.

A reinsurer will be bound by a settlement agreed to by the ceding company if it is reasonably within the terms of the original policy, even if not technically covered by it (see *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583, 596-597 [2001]; *Allstate Ins. Co. v American Home Assur. Co.*, 43 AD3d 113, 120-121 [2007], *lv denied* 10 NY3d 711 [2008]). This doctrine prevents the reinsurer from "second-guessing" the settlement decisions of the ceding company, and "imposes a contractual obligation upon the reinsurer to indemnify the ceding company for payments it makes pursuant

to a loss settlement under its own policy, provided that such settlement is not fraudulent, collusive or otherwise made in bad faith, and provided further that the settlement is not an ex gratia payment, i.e., one made by a party that recognizes no legal obligation to pay, but makes payment to avoid greater expense, as in the case of a settlement by an insurance company to avoid the cost of a suit" (*Granite State Ins. Co. v ACE Am. Reins. Co.*, 46 AD3d 436, 439 [2007] [citation omitted]).

There is no evidence that, at the time of the 1993 settlement, National Union acted other than in good faith, as during the years leading up to the settlement, the pollution exclusion, as well as other coverage terms and defenses were both litigated and negotiated. The settlement was also favorable to both parties. The limits of the reinsured policies applied on a "per occurrence" basis. The underlying insured settled the Anniston litigation in 2004 for $600 million. Thereafter, it presented a claim to National Union and its affiliates for a capped amount of $150 million once the $80 million "deductible" had been satisfied by the insured.

However, on December 9, 1993, mere months after the 1993 settlement was reached, the Delaware Superior Court ruled in a declaratory judgment action commenced by the underlying insured against National Union and others, that the sudden and accidental pollution exclusions of 38 moving insurers barred coverage in this matter (*see Monsanto Co. v Aetna Cas. & Sur. Co.*, 1993 WL 563253, 1993 Del Super LEXIS 442 [1993], *affd* 653 A2d 305 [Del 1994]). This circumstance presents issues of fact as to whether National Union settled in good faith. Moreover, the affidavit of Everest's claims representative, who attested that he had read the 1993 settlement agreement by 2003, raises issues of fact as to the applicability of waiver and estoppel. Concur—Mazzarelli, J.P., Friedman, Catterson, Renwick and Freedman, JJ.